IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CARNELL CONSTRUCTION CORP.,          )
                                     )
          Plaintiff/Counterclaim Defendant,    )
                                     )
v.                                   )
                                     )
DANVILLE REDEVELOPMENT &             )
HOUSING AUTHORITY                    )     Case No. 4:10CV00007
                                     )
          Defendant/Counterclaim Plaintiff    )
                                     )
v.                                   )     **MEMORANDUM OPINION**
                                     )
BLAINE SQUARE, LLC                   )
                                     )     By: Jackson L. Kiser
          Defendant/Counterclaim Plaintiff    )     Senior United States District Judge
                                     )
v.                                   )
                                     )
INTERNATIONAL FIDELITY               )
INSURANCE COMPANY,                   )
                                     )
          Counterclaim Defendant.    )


    Before me is Defendant/Counterclaim Plaintiff Danville Redevelopment & Housing

Authority's and Defendant/Counterclaim Plaintiff Blaine Square, LLC's Motions for Summary

Judgment against Carnell Construction Corporation. The parties filed supporting and opposing

briefs to the motions and I heard oral argument on January 4, 2011. The matter is now ripe for

decision. For the reasons stated below, I will **DENY** in part and **GRANT** in part Defendants'

Motions for Summary Judgment.

**I. STATEMENT OF FACTS**

This case stems from work performed on Phase 4 of the Blaine Square Hope VI Project in Danville, VA ("the Project"). The Project involved the fourth phase in plans to construct forty single family and duplex housing units in Danville, VA. Second Amended Compl., 3, ECF No. 43. The Project was funded through a combination of Hope VI funds from the United States Department of Housing and Urban Development ("HUD") and the Virginia Housing Development Authority ("VDHA"). Ulbing Dep., 59-60. Hope VI is a grant program under HUD developed for the purpose of eradicating severely distressed public housing. Second Amended Compl., 3, ECF No. 43.

Defendant/Counterclaim Plaintiff Danville Redevelopment & Housing Authority ("DRHA") is a Public Housing Agency. *Id.* Cornerstone Danville, LLC ("Cornerstone") was the master developer for DRHA's entire Hope VI Grant, including the prior three phases of the Grant. *Id.* Defendant/Counterclaim Plaintiff Blaine Square, LLC ("Blaine Square") is an entity that was formed to develop, own, maintain, and operate the Project. *Id.* Cornerstone, as master developer, applied on behalf of DRHA for an award of tax credits to Blaine Square in connection with the Project. (DRHA's First Discovery Re., 8; DRHA's Supp. Discovery Re., 4.) Blaine Square was awarded those credits. *Id.* Cornerstone also negotiated the terms of and entered into a contract with The Commodore Corporation ("Commodore") for the building work associated with the Project. Def.'s Br. Summ. J., 3, ECF No. 58. Cornerstone did not employ competitive bidding to secure the Commodore agreement. *Id.* The Project engineer was Dewberry & Davis ("Dewberry"). Dewberry was responsible for certifying Plaintiff's work as satisfactory before Defendant would issue payments. *Id.*

In an effort to save money, DRHA decided to procure the necessary site preparation work for the Project through competitive sealed bidding open to the public instead of allowing Cornerstone to secure a contractor. *Id.* Plaintiff/Counterclaim Defendant Carnell Construction

Corporation ("Carnell"), a construction firm specializing in site preparation and a minority-owned business, submitted the low bid. Michael Scales Dep., 20. DRHA accepted Carnell's bid, and on May 27, 2008, DRHA and Carnell entered into a contract (hereinafter the "Contract") for Carnell to perform the Site Work for the Project for a sum of $793,541.00. Second Amended Compl., 3, ECF No. 43. The Contract incorporated two sets of general conditions: C-700 Standard General Conditions of the Construction Contract ("EJCDC General Conditions") and HUD-5370 General Conditions for Construction Contracts—Public Housing Programs ("HUD-5730 General Conditions"). Pl.'s Br. Opp. Summ. J., 8, ECF No. 82.

Shortly after executing the Contract, DRHA assigned its interest in the Contract to Blaine Square, though DRHA continued to supervise the site preparation work under the Contract. *Id.* at 5. Counterclaim Defendant International Fidelity Insurance Company ("IFIC"), a New Jersey corporation with its principal place of business in Newark, New Jersey, then issued a Performance Bond ("the Bond") to Carnell on June 4, 2008, thereby acting as Carnell's surety on the Project. Def.'s Br. Summ. J., 5, ECF No. 58.

DRHA issued Carnell a Notice to Proceed on May 27, 2008. Ulbing Dep., Ex. 6, p. 89, ECF No. 82-1. Carnell began work on the Project on June 9, 2008 but was immediately forced to stop because another contractor had not finished clearing the site. Michael Scales Dep., 50-51, 74. Due to the delay, Carnell did not begin working in earnest until June 16, 2008. *Id.* at 75. That initial holdup presaged further problems and the parties soon became dissatisfied with each other's performance under the Contract. By letter dated January 5, 2009, addressed to Carnell and copied to IFIC, DRHA informed both parties that "[a]t this point, Carnell Construction's contract with DRHA is seriously behind schedule, which could result in DRHA loosing several thousand dollars . . . . we can not consider Carnell Construction's progress or performance satisfactory." Maloney Deposition, Ex. 1.

Simply put, Carnell's costs exceeded expectations and the parties disagree as to who should bear responsibility. Second Amended Compl., 5; Counterclaim to Second Amended Compl., 2. DRHA argues that Carnell "failed to perform according to the plans and specifications and pursuant to the work schedule." Ulbing Dep., Ex. 16, p. 23, ECF no. 82-4. Carnell argues that DRHA changed the site plans without informing Carnell and that Carnell's work was accurate based on the plans they were originally given. Pl.'s Br. Opp. Summ. J., 9. The parties met in December, 2008, to resolve their differences and were temporarily successful. *Id.* at 21. They agreed to submit their cost dispute to mediation and that Carnell would continue working on the Project. *Id.* The parties entered into mediation on April 6, 2009, but were unable to resolve their issues. Pl.'s Br. Opp. Summ. J., 23. Moreover, the parties now appear incapable of even agreeing on what claims currently in dispute were actually mediated. Def's Reply Br., pp. 15-16, ECF No. 16; Vincent Scales Decl. ¶ 9, ECF No. 82-12.

By letter dated May 14, 2009, DRHA, through counsel, notified Carnell that, among other things, Carnell should remove all equipment and personnel from the site on the contract's completion date regardless of whether Carnell had completed the Site Work. Def.'s Br. Opp. Summ. J., 5, ex. D, ECF No.75. The Contract's original completion date was June 3, 2009; however, one day was added to the Contract by change order, thereby extending the completion date to June 4, 2009. Form of Contract at 2; Scales Dep. Tr. at 227. Carnell left the Project on or about May 14, 2009, with some work left incomplete. Vincent Scales Dep., 227-28. On July 7, 2009, Carnell mailed 25 invoices for extra or additional work Carnell allegedly performed, totaling $359,084.42. Def.'s Br. Summ. J., 10. Carnell's invoices were rejected in writing on July 23, 2009. *Id.* By letter dated December 14, 2009—seven months after Carnell left the Project—counsel for DRHA informed IFIC that DRHA was "considering declaring a Contractor Default" and requested a conference with Carnell and International Fidelity within 15 days "to

discuss methods of performing the Construction Contract." Maloney Dep., ex. 16. A telephone conference was held on January 29, 2010 among DRHA and its counsel, Carnell and its counsel, Dewberry & Davis, the engineer and subcontractor, and International Fidelity. *Id.* On February 15, 2010, DRHA declared a Contractor Default against Carnell under the Bond. Maloney Dep., ex. 26.

Additionally, at various times throughout the Project, Carnell complained that it was being singled out and discriminated against due to its status as a minority contractor. Pl.'s Br. Opp. Summ. J., 17. Carnell evidences numerous factors that led to its complaints, including an email exchange between Gary Wasson, DRHA's Executive Director and President, and Cedric Ulbing, DRHA's Hope VI Director. In discussing Carnell's low bid for the Project work, Ulbing stated in an email to Wasson, "[i]t has been my experience that minority contractor's don't tend to pay their labor as highly. It may be because of their desire to compete, or just traditional acceptance of lower wages, but in my opinion this is historically correct." Def.'s Br. Summ. J., 4. Carnell also notes that DRHA treated it disparately compared to other Project contractors. For example, DRHA held 10% retainage from Carnell's progress payments, but less from Commodore, "even though it was performing work on the same project for the same owner at the same time and was being paid through the use of HUD funds." Pl.'s Br. Opp. Summ. J., 9. Carnell also highlights DRHA's requirement that Carnell provide certain licenses and a 100% payment and performance bond not required from other contractors, and DRHA's rejection of Carnell's payroll format that was identical to other, non-minority contractors' formats. *Id.* at 8.

## II.  PROCEDURAL BACKGROUND

Carnell filed suit in February, 2010, alleging that DRHA breached the Contract and seeking recovery for intentional race discrimination pursuant to 42 U.S.C. § 2000d. Carnell amended its complaint twice and added Blaine Square a defendant in October 2010. Defendant

answered each complaint and filed counterclaims against Carnell. Defendant also added IFIC as a counterclaim defendant. Defendants Blaine Square and DRHA now move for summary judgment against Carnell, with Blaine Square simply adopting in total DRHA's supporting brief.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). The court must view the facts and the inferences to be drawn from them in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. DISCUSSION

I. *The Contractual Change Order Provisions:*

DRHA first argues that it is entitled to summary judgment because Carnell failed to satisfy the conditions precedent to recovery in the Contract regarding claims for extra work. The Contract's EJCDC General Conditions and the HUD General Conditions set forth the procedures that a contractor must follow to authorize work changes. When a contractor believes that it has been instructed or required to do work which is not within the original scope of the contract, it must—within thirty days—(1) give written notice to the owner that it regards the order to do such work as a change order, and (2) provide the owner with a written statement of the nature of the work and the amount of the requested price adjustment. HUD General Conditions §§ 29(b), 29(e). Similarly, if the Contractor seeks an adjustment of the contract price, it must provide written notice of the nature of the claim to the engineer and owner within thirty days of the event giving rise to the claim. EJCDC General Conditions § 10.05(B). Within sixty days of the event

giving rise to the claim, the Contractor must provide notice of the amount and extent of the claim with supporting data and a statement that the amount listed is the full amount sought for the claim.  *Id.*  The engineer then reviews the request and approves it, denies it or states that it is inappropriate for him to decide the issue.  *Id.* § 10.05(C).

Carnell did follow the contractual change order procedures on a number of occasions and DRHA often approved the requests:  "[v]arious change order requests of Carnell were approved, resulting in an upward adjustment of the Contract price to a total of $849,368.68" from the original Contract price of $793,541.00.  Def.'s Br. Summ. J., 9.  Carnell claims that further change orders were rejected once the parties entered mediation because DRHA was worried that any such approval would serve as an admission of liability in the mediation.  Pl.'s Br. Opp. Summ. J., 30.  Despite the refusal to follow the change order process, Carnell continues, DRHA still insisted that Carnell work under plans that differed from those referenced in the Contract.  *Id.* at 30-35.  As such, Carnell contends, "DRHA and Carnell agreed to modify the change order procedure described in the subject contract by requiring Carnell to perform the work necessitated by the various changes introduced into the Project and agreeing to submit the propriety of Carnell's claims for payment to mediation."  *Id.* at 30.

The Virginia Supreme Court has consistently held that contractual conditions precedent to recovery for additional work performed on a construction project are binding on the parties, and a plaintiff cannot prevail where those conditions precedent have not been satisfied.  *See, e.g.*, *Atlantic & Danville Ry. Co. v. Delaware Construction Co.*, 98 Va. 503, 37 S.E. 13 (1900).  As such, "[n]o claim for extra work, if any there were, was therefore allowable, *unless the said provision was duly waived*." Id. at 505, 16.  The Virginia Supreme Court discussed contract modification and waiver in *Cardinal Development Co. v. Stanley Const. Co., Inc.*, 255 Va. 300, 497 S.E.2d 847 (1998), stating

> [A] course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms of [a] contract . . . . But the circumstances surrounding the conduct of the parties must be sufficient to supporting a finding of a 'mutual intention' that the modification be effective . . . and such intention must be shown by 'clear, unequivocal and convincing evidence, direct or implied' . . . . And when one party claims that the other party has surrendered a right guaranteed by the contact, the party asserting such modification must prove either passage of valuable consideration, estoppel *in pais*, or waiver of the right."

Id. at 305, 851 (citing *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73, 306 S.E.2d 870, 873 (1983); *Kent v. Kent*, 2 Va.Dec. 674, 678, 34 S.E. 32, 33 (1899); *Warren v. Goodrich*, 133 Va. 366, 388, 112 S.E. 687, 694 (1922); *Atlantic Coast Line v. Bryan*, 109 Va. 523, 65 S.E. 30 (1909)). DRHA further contends that "a definite agreement to pay is required to establish waiver," citing *Service Steel Erectors Co. v. SCE, Inc.*, 573 F.Supp. 177 (W.D. Va 1983), but the court in that case was simply quoting the 8th Circuit's opinion in *Linneman Construction, Inc. v. Montana-Dakota Utilities Co.*, 504 F.2d 1365 (8th Cir. 1974). Virginia has not adopted the "definite agreement to pay" rule as a requirement, but it is a factor the courts look to in determining the existence of a waiver. *See, e.g.*, *Artistic Stone Crafters v. Safeco Ins. Co.*, 2010 WL 2977894 (E.D.Va. 2010).

In *Cardinal Development*, 255 Va. 300, 497 S.E.2d 847 (1998), the Virginia Supreme Court found that the parties had modified their contract regarding extra work claims. Defendant Cardinal appealed the trial court's finding that it had breached its contract with Plaintiff Stanley Construction based on the former's refusal to pay the latter for extra work performed in relation to the construction of a residential subdivision in Hanover County. *Id.* at 302. Modifications to the original contract plans increased the size of the subdivision from 42 to 62 lots. *Id.* at 306. The parties met and talked about the changes, with Defendant directing Plaintiff to proceed with the project and to provide "fair" billing for the additional work. *Id.* Plaintiff periodically submitted detailed invoices regarding the extra work to Defendant, who in turn paid Plaintiff on

those invoices without complaint. *Id.* "Cardinal's agreement to pay for the additional work along with Stanley Construction's actual performance of that work, constitutes valuable consideration sufficient to modify the contract." *Id.*

In *Ross Engineering Co. v. Pace*, 153 F.2d 35 (4th Cir. 1946), the Fourth Circuit found that the parties had waived the change order procedure included in their contract concerning the construction of the Armed Guard School at Camp Bradford, Virginia. *Id.* at 38, 49-50. Ross, the Defendant at trial, was the general contractor and plaintiffs were subcontractors and sub-subcontractors under Defendant. *Id.* at 37. Numerous claims for uncompensated work resulted in lawsuits, which were consolidated for trial. *Id.* On appeal, Defendant argued that "none of the disputed items were susceptible of proof because they were not supported by written orders . . . as required by the contracts between the parties." *Id.* at 48. The contracts "provided that no alterations should be made in the work covered by the contract except upon the written order of Ross stating the amount to be added to or deducted from the contract price." *Id.* at 49. In rejecting Defendant's argument for application of the provision, the court observed, "[f]rom the beginning of the contract work the parties to the subcontract ignored the provisions as to written orders and proceeded with the work with little or no regard for them." *Id.* Defendant had also provided one subcontractor with change order procedures that differed from the contractual requirements. *Id.* Further, Defendant paid for additional work that was not done subject to a change order. *Id.* "We think that under these circumstances, there was substantial ground for the position of [Plaintiff] that the contract provisions in regard to written orders were waived by Ross by its conduct throughout the period covered by the construction of the camp." *Id.*

In the present matter, genuine issues of material fact exist concerning the scope and nature of the parties' mediation in relation to the claims in dispute such that I cannot say, as a matter of law, that Carnell was required to follow the contractual change order procedures.

Reading the facts in the light most favorable to Plaintiff, the non-movant, reasonable jurors could find by a preponderance of the evidence that DRHA waived its right to enforce the contractual dispute resolution procedures and instead agreed to incorporate all of Carnell's claims into the mediation process. On December 12, 2009, the parties met to discuss their problems with extra work and cost overruns. Both Gary Wasson and Cedric Ulbing were in attendance for Defendants. Wasson Dep., 40-41, Dec. 20, 2010. Vincent Scales, Carnell's Project Manager, testified that the parties agreed to mediate all issues related to Carnell's extra work. (Vincent Scales Decl. ¶ 9, ECF No. 82-12. Ulbing and Wasson contend that the scope of mediation was narrower, but disagree between themselves as to what, exactly, it covered. Wasson Dep., 40-41, Dec. 20, 2010, Ulbing Dep. 250-52. Accordingly, the scope of the mediation is a disputed issue of fact. If Wasson, Ulbing and Defendants agreed to incorporate all present and future claims for extra work into the mediation, then a reasonable jury could find that DRHA waived its right to enforce the change order provisions in the contract. Significantly, the mediation is evidenced by several writings, including correspondence between Carnell and the American Arbitration Association, email between Plaintiff's and Defendants' counsel, and project meeting minutes. Def.'s Reply Br., 15-16, Pl.'s Suppl. Response to Reply, ex. 4. Moreover, Wasson testified that DRHA would not sign any more change orders after the dispute began, and Ulbing conveyed that sentiment to Carnell. Wasson Dep. ex. 30, Michael Scales Dep., 166. DRHA cannot claim the protection of a contractual provision which it instructed Carnell not to follow. While, unlike *Ross* and *Cardinal Development*, there is no evidence of an agreement to pay, a definite agreement to mediate all claims, evidenced by writing, constitutes the "clear, unequivocal and convincing evidence" necessary to show "mutual intention" that the parties waived or modified the Contract's dispute resolution procedures. *Cardinal Development*, 255 Va. at 305, 497 S.E.2d at 851.

*2.     Quantum Meruit*

> "To establish a right to relief on [a quantum meruit] basis under Virginia law, the claimant must show that (i) he rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant."

*Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489 (4th Cir. 1992).

Also, "[i]t is a 'well settled' rule that 'one cannot obtain *quantum meruit* relief from another if he

has expressly delineated the contractual obligations the two will have on the subject  matter in

question.'"  *Pennsylvania Electric Coil, LTD. v. City of Danville*, 2008 WL 919535 (W.D. Va.

2008).  In order to survive Defendant's Motion for Summary Judgment on this issue, then,

Plaintiff must show that the additional work it cites as the basis for its *quantum meruit* claim falls

outside the scope of the Contract.  Carnell does not offer any such evidence; instead, it argues

that *Pennsylvania Electric* is distinguishable on the facts and, as such, Carnell need not meet that

case's burden.  Carnell states, "[t]he court in *Pennsylvania Electric* held that the existence of the

underlying contract and change order provision barred the plaintiff's claim because the plaintiff

failed to supply a reason for its failure to continue complying with the provision as work

progressed.  Pl.'s Br. Opp. Summ. J., 39 (citing *Pennsylvania Electric*, 329 Fed.Appx. 399, 404).

Plaintiff misreads that case.  The court's observation that Plaintiff failed to provide a reason for

its non-compliance with the contractual provisions was not central to its decision.  Instead, the

court rested its conclusion on the fact that "there is a valid, enforceable contract that governs the

parties' rights and lays out a change order procedure" which it failed to utilize.  *Pennsylvania

Electric*, 329 Fed.Appx. 399, 404.  As such, Plaintiff has not met its burden to avoid summary

judgment on this count.  The Virginia Supreme Court's decision in *Main v. Dep't of Highways*,

206 Va. 143, 142 S.E.2d 524 (1965) reinforces this conclusion.  There, the court denied

Plaintiff's *quantum meruit* claim for extra work, where Plaintiff failed to follow the proper claim

procedures under a contract which governed the claim. Id. With no mention of whether Plaintiff had provided a reason for its failure to comply, the court rejected the *quantum meruit* claim because the extra work was within the scope of the governing contract. *Id*. at 152, 530-31.

3.    *The Virginia Public Procurement Act*

The Virginia Public Procurement Act ("VPPA") ensures "that all procurement procedures be conducted in a fair and impartial manner with avoidance of any impropriety or appearance of impropriety . . . ." Va. Code § 2.2-4300(C).  It applies to contracts between public bodies of the commonwealth and nongovernmental entities. Va. Code § 2.2-4303(A).  DRHA is a public body under the VPPA.  Va. Code § 2.2-4301.  The VPPA limits the amount that a fixed price contract may be increased and sets forth additional notice requirements regarding a contractor's intention to file a claim.  Va. Code §§ 2.2-4309, 2.2-4363(A).  Defendant argues that these provisions bar Plaintiff's claims.  Def.'s Br. Summ. J., 31.  Shortly after the Contract's execution, however, DRHA assigned its interest in the Contract to Blaine Square, a private entity.  *Id.* at  5.  A contract between two private parties is not subject to the VPPA.  Va. Code § 2.2-4303(A).  Therefore, Plaintiff contends that the VPPA's relevancy ceased after the assignment.  (Pl.'s Supp. Response to Reply, 11.  This assumption ignores the assigning instrument itself, which "assigns . . . all of [DRHA's] obligations under and rights, title and interest in and to the contract" to Blaine Square.  Assignment Contract, ECF No. 58-2, p. 26.  DRHA's obligations under and rights in the Contract included those required and secured under the VPPA.  "It is well settled that an assignee of a contract obtains his rights from the assignor and, thus, 'stands in the shoes' of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract."  *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*, 258 Va. 524, 528 (1999) (citing *Union Recovery Ltd. Partnership v. Horton*, 252 Va. 418, 423 (1996), *Fidelity & Cas. Co. Of N.Y. v. First Nat'l Exchange Bank of Va.*, 213 Va. 531, 538 (1973), *National Bank & Trust*

*Co. at Charlottesville v. Castle*, 196 Va. 686, 692-93 (1955)).

Moreover, Plaintiff's argument assumes that DRHA was no longer a party to the contract after it assigned its interest to Blaine Square. DRHA was the 100% managing member of Blaine Square and DRHA continued to supervise the project after the assignment. Mixed Finance Amendment to Consolidated Annual Contributions Contract, ECF No. 91-10. It would be contrary to public policy for a public entity to escape the strictures of the VPPA simply by assigning its interest in a procurement contract to a private entity it manages concerning a project it oversees. The VPPA applies to DRHA's *and* Blaine Square's contract with Carnell.

Plaintiff nonetheless contends that the Contract is expressly exempted from the VPPA under the Act's "Exemptions and Limitations" provisions. Specifically, Plaintiff cites Va. Code § 2.2-4343(A)(14), which reads:

> A. The provisions of this chapter shall not apply to:
>
> . . .
>
> 14. Procurement of any construction or planning and design services for construction by a Virginia nonprofit corporation or organization not otherwise specifically exempted when … (ii) the Virginia nonprofit corporation or organization is obligated to conform to procurement procedures that are established by federal statutes or regulations, whether those federal procedures are in conformance with the provisions of this chapter.

Because Blaine Square was a nonprofit organization, plaintiff argues, this section exempts the Contract from the VPPA. Pl.'s Supp. Response to Reply, 11. Plaintiff misreads this section. It applies when a public body, as defined in the VPPA, contracts with a Virginia nonprofit corporation—itself subject to federal regulations—for the *latter* to provide construction services for the former. Plaintiff's reading—that the VPPA exempts a contract between a Virginia nonprofit and a nongovernmental entity—is nonsensical. The VPPA does not apply when two private parties contract and would not, therefore, specially exempt such a contract.

13

The express exemption that is relevant, however, is 2.2-4343(B), which states

> Where a procurement transaction involves the expenditure of federal assistance or contract funds, the receipt of which is conditioned upon compliance with mandatory requirements in federal laws or regulations not in conformance with the provisions of this chapter, a public body may comply with such federal requirements, notwithstanding the provisions of this chapter, only upon the written determination of the Governor, in the case of state agencies, or the governing body, in the case of political subdivisions, that acceptance of the grant or contract funds under the applicable conditions is in the public interest. Such determination shall state the specific provision of this chapter in conflict with the conditions of the grant or contract.

There being no such written determination in evidence, the VPPA applies.

Because the VPPA does apply, Plaintiff was required to comply with its procedures for filing a contractual claim. Section 2.2-4363(A) of the Virginia Code provides:

> Contractual claims, whether for money or other relief, shall be submitted in writing no later than 60 days after final payment. However, written notice of the contractor's intention to file a claim shall be given at the time of the occurrence or beginning of the work upon which the claim is based. Nothing herein shall preclude a contract from requiring submission of an invoice for final payment within a certain time after completion and acceptance of the work or acceptance of the goods. Pendency of claims shall not delay payment of amounts agreed due in the final payment.

In *Dr. William E.S. Flory Small Business Development Center, Inc. v. Virginia*, 261 Va. 230 (2001), the Virginia Supreme Court applied the above section to a case similar to the one at bar. That case involved a contract between the Virginia Department of Business Assistance ("VDBA") and Plaintiff's Development Center ("the Center"), the former qualifying as a public entity and the latter a private entity under the VPPA. *Id.* at 233, 235. The VDBA provided the Center with federal funds from the United States Small Business Administration for business development. *Id.* at 233. The VDBA would not release the funds to the Center until the parties signed a Memorandum of Agreement. *Id.* Plaintiff refused to sign the Agreement until differences over certain terms were negotiated, but nonetheless continued to provide the same

services to its clients in reliance on the undispersed VDBA funding. *Id.* at 234. Six months later, Plaintiff submitted a set of invoices for the amount of money allegedly due. *Id.* The VDBA refused payment because the parties still had not signed the Agreement. *Id.* Plaintiff countered that refusal by filing suit. *Id.*

The trial court granted VDBA's plea in bar based in part on the notice section of the VPPA, and the Center argued on appeal that the trial court erred because the invoices it served on the VPPA constituted adequate notice. *Id.* at 237-38. As an initial observation, the Virginia Supreme Court noted that the VPPA imposes "mandatory, procedural requirements which must be met in order for a court to reach the merits of a case." *Id.* at 238. Concerning Section 2.2-4363(A) (then Section 11-69(A)), the Court reasoned, "the statute does not specifically require that the notice of intent be separate and distinct from the claim itself in time or in form. By identifying more than one event that triggers the filing of an intent to file a claim, the statute acknowledges that not all claims will arise under the same circumstances." *Id.* As such, "the timing and form of an alleged notice of intent pursuant to [Section 2.2-4363(A)] requires an examination of the circumstances of each case." *Id.* Because the Center knew that a signed Agreement was a prerequisite to payment but continued to provide its services without one and then submitted invoices six months later with no intermediate notice of its reimbursement claim, the Court found that the invoices were "insufficient" notice under the VPPA. *Id.* at 238-39.

In the present matter, Defendant argues that "[i]t is undisputed that Carnell provided no written notice of DRHA of its intention to file a claim for the work described in any of the Invoices" and, therefore, the VPPA bars recovery. Def.'s Reply Br., 22. Defendant's problem is that adequate notice is a disputed fact. As Vincent Scales stated in a sworn declaration, "[f]ollowing the conclusion of the mediation, Carnell delivered a notice of its intention to file suit to DRHA." Declaration of Vincent Scales, 3, ECF No. 82-12. Taking that as true for the

purposes of Defendant's Rule 56 motion, and that the mediation encompassed all claims as discussed above, Carnell did provide notice to DRHA of its intent to file suit on all contractual claims immediately after mediation. This would constitute adequate notice under the "at the time of occurrence" language of Section 2.2-4363(A), because until the mediation was concluded unsuccessfully, Carnell could not have known whether it needed to file suit. Moreover, noticing an intent to file suit before mediation commenced could indicate bad faith in mediation on behalf of the filing party. Summary judgment on this count would be inappropriate.

The VPPA also limits the amount that a fixed-price contract may be increased. Section 2.2-4309 reads

> A. A public contract may include provisions for modification of the contract during performance, but no fixed-price contract may be increased by more than twenty-five percent of the amount of the contract or $50,000, whichever is greater, without the advance written approval of the Governor or his designee, in the case of state agencies, or the governing body, in the case of political subdivisions. In no event may the amount of any contract, without adequate consideration, be increased for any purpose, including, but not limited to, relief of an offeror from the consequences of an error in its bid or offer.

There being no written approval in evidence authorizing a greater deviation, the twenty-five percent limitation in Section 2.2-4309 applies to the Contract. The original fixed-price sum of the Contract was $793,541.00 and was increased to $849,368.68 through various approved change orders. Def.'s Br. Summ. J., 9. Twenty-five percent of the original contract price is $198,385.25. Minus the $55,827.68 already added to the original price, the remaining amount by which the Contract could be increased by claims for extra work is $142,557.57. Therefore, the amount that Carnell can recover for additional work under the contract is limited, as a matter of law, to a statutory maximum of $142,557.57.

*4. Racial Discrimination under Title VI*

    *a. Threshold Bars to Recovery*

DRHA raises three procedural challenges to Carnell's ability to claim discrimination under Title VI: (1) Plaintiff, as a corporation, lacks standing under Title VI; (2) Plaintiff does not qualify as an intended beneficiary of the federal funds DRHA administered; (3) Plaintiff's Title VI claim fails to comport with the notice and dispute resolution procedures in the Contract. Def.'s Br. Summ. J., 34, 35, 37.

### 1. *Corporate Standing Under Title VI.*

In *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, the United States Supreme Court stated, "[a]s a corporation [Plaintiff] has no racial identity and cannot be the direct target of the petitioners' alleged discrimination." *Id.* at 263. There, Plaintiff argued that Defendant's denial of a rezoning request violated Plaintiff's Fourteenth Amendment rights and the Fair Housing Act. *Id.* at 254. Plaintiff needed the property rezoned from single-family to multiple-family classification to proceed with its plans to build low- and moderate-income townhouses. *Id.* The Court found that Plaintiff met the Constitutional requirements for standing, but its corporate status presented a prudential bar. *Id.* at 263. The Court then raised the question of whether Plaintiff corporation had standing to assert the rights of third persons. *Id.* It declined to answer its own question, though, because the Court instead found that an individual black Plaintiff did have standing to bring the claim, and thus the case proceeded to the merits. *Id.* at 263-64.

Defendant cites the language from *Arlington Heights* and argues that it bars Carnell's intentional discrimination claim. Def.'s Br. Summ. J., 34. The Fourth Circuit also cited *Arlington Heights* for this proposition in *Worldwide Network Services, LLC v. Dyncorp International, LLC*, 365 Fed.Appx 432, 2010 WL 489477 (4th Cir. 2010), but there it upheld judgment in favor of the corporate plaintiff on a § 1981 claim. *Id.* at 443, *8. In vacating the trial court's award of punitive damages, the Court reasoned that could not find sufficient

evidence in the record that Defendant discriminated "with malice or with reckless indifference to the federally protected right," a necessary element for § 1981 punitive damages. *Id.* at 445, *10. In a footnote, the Court observed that *Arlington Heights* supported its decision to vacate because "whether a corporation may sue under § 1981 was never crystal clear." *Id.* at 447, *12 n. 13. It does not appear as though the issue of standing was ever raised.

The Second Circuit considered this issue in the context of §§ 1981, 1983, 1985, and 2000(d) in *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir. 1982). In considering the Supreme Court's language in *Arlington Heights* regarding corporate plaintiffs, the Second Circuit reasoned, "[a]lthough a literal reading of one sentence in the Arlington Heights opinion indeed supports the [lower court's] ruling, the sentence was of only academic importance and we do not believe that the Supreme Court would slavishly apply it so as to deny [Plaintiff] its day in court." *Id.* at 704. The Second Circuit found that Plaintiff did have standing, noting that it would be "hard to believe" that a corporate plaintiff could lack standing because it "has no racial identity," but simultaneously deny stockholders standing because "the injury was suffered by the corporation and not by them." *Id.* at 706. In *Emory Utilities, Inc.v. Time Warner Cable, Inc.*, 2010 WL 2402888 (E.D.N.C. 2010), Judge Boyle adopted the reasoning of *Hudson Valley*, writing, "this Court is persuaded that a minority owned business does have standing to pursue a claim under 42 U.S.C. § 1981." *Id.* at *2. The Fourth Circuit also allowed a plaintiff corporation to proceed under a § 1981 claim in *J.A. Croson Co. v. Richmond*, 822 F.2d 1355 (4th Cir. 1987), but it does not appear as though standing was raised as an issue. Like Judge Boyle, I am persuaded that Carnell has standing to bring its claim for intentional race discrimination pursuant to Title VI, its corporate identity notwithstanding.

    2.    *Carnell as an Intended Beneficiary*

Title VI, section 601 states, "[n]o person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Thus, "[t]he twin purposes of Title VI are 'to avoid the use of federal funds to support discriminatory practices,' and 'to provide individual citizens with effective protection against those practices.'" *Bogdan v. Housing Authority of the City of Winston-Salem*, 2006 WL 3848693, *4 (M.D.N.C.) (citing *Chowdhury v. Reading Hosp. & Medical Ctr.*, 677, F.2d 317, 319 (3d Cir. 1982); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)). "Title VI essentially creates a contract between the Government and recipient of the funds, 'conditioning an offer of federal funding on a promise by the recipient not to discriminate." *Bogdan*, 2006 WL 3848693 at *4 (citing *Gebster v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)).

DRHA argues that, in order to prevail under Title VI, Carnell must establish that it was an intended beneficiary of DRHA's federally funded program. Def.'s Br. Summ. J., 36. Carnell cannot make that showing, DRHA contends, because "[t]he intended beneficiaries of HOPE VI funds used for the Project are individuals in need of the Projects forty (40) single family and duplex housing units. Carnell argues that proper Title VI plaintiffs are not just "intended beneficiaries," but also include litigants within the "zone of interests" or with a "logical nexus" to the federally funded program. (Pl.'s Br. Opp. Summ. J., 43-44.)

DRHA relies on the Fourth Circuit's language in *Ingram v. Morgan State University*, 74 F.3d 1232, 1996 WL 13861 (4th Cir. 1996), where the Court confirmed the district court's dismissal of Plaintiffs Title VI claim for lack of standing. *Id.* at *1. The Court wrote, "[Plaintiff's] Title VI claim fails because Appellant has not alleged that the Defendants receive federal financial assistance for the primary purpose of employment, or that she was the intended beneficiary of any such assistance." *Id.* The *Ingram* opinion is less than one page, unpublished, and the excerpted portion is the entirety of its Title VI analysis. DRHA also cites the Fifth

Circuit's opinion in *Azteca Enterprises, Inc. v. Dallas Area Rapid Transit*, 31 Fed.Appx 839, 2002 WL 261521 (5th Cir. 2002), where the Court stated that a Title VI plaintiff "must allege that he is the 'intended beneficiary'" of the federal funding. *Id.* at *2. In that case, Plaintiff complained of racial discrimination in Defendant's bid selection process for contractors to build a federally funded light-rail transportation system. *Id.* at *1. The Fifth Circuit observed that "[t]he intended beneficiaries of transit system [sic] are the commuters, rather than contractors or vendors." *Id.* at *2. DRHA fails to note, however, that the Fifth Circuit adopted the logical nexus requirement, stating, "[t]here 'must be some logical nexus between a person's 'participation' and the federally funded program in order for [Title VI] to apply'" *Id.* at *2 (citing *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981)). The Fifth Circuit did not find such a nexus in *Azteca*, but there Plaintiff was just a bidder, and no contract ever existed between it and the federally funded Defendant. *Id.* The Court noted, "even if there had been a contract in place it would by no means *automatically* qualify [Plaintiff] as a participant under Title VI." *Id.* (emphasis added). The Fifth Circuit's observation that a contract would not automatically qualify Plaintiff as a Title VI participant impliedly concedes that contractor in privity with a federally funded Defendant could have Title VI standing depending on the facts.

Other district courts in the Fourth Circuit have likewise found that a contractor to a federally funded project can have Title VI standing. *See Maryland State Conference of NAACP Branches v. Maryland Department of State Police*, 72 F.Supp.2d 560 (D. Md. 1999) (adopting "zone of interests" standard in granting Plaintiff Title VI standing), *Bogdan*, 2006 WL 3848693 (adopting "logical nexus" standard in granting Plaintiff Title VI standing). I find Judge Osteen's opinion in *Bogdan* persuasive. Denying standing to a contractor with a logical nexus to a federally funded program would effectively "[a]llow[] Defendants to subject Plaintiff to

discrimination without fear of losing federal funding," which "offends both the purpose and plain language of Title VI." *Bogdan*, 2006 WL 3848693 at *7. In *Guardians Ass'n v. Civil Serv. Comm'n of New York*, 463 U.S. 582 (1983), the Supreme Court stated, "[b]ecause Title VI is intended to ensure that 'no person' is subject to discrimination in federally assisted programs, private parties function as third-party beneficiaries to these contracts." *Id.* at 633 (citations omitted). As Judge Osteen observes, "[t]he broad references to 'person' and 'private parties' emphasize Title VI's wide application to those who suffer discrimination from a federally assisted entity." *Bogdan*, 2006 WL 3848693 at *6. A logical nexus exists where Plaintiff is either an intended beneficiary of, an applicant to, or a participant in the federally funded program. *Id.* (citing *United States v. Harris Methodist Fort Worth*, 970 F.2d 94 (5th Cir. 1992)).

I find that Carnell has standing to make a claim under Title VI because it has a logical nexus to DRHA's Hope VI federal grant. Carnell and DRHA entered into a contract funded through federal dollars and subject, in part, to the federal HUD General Conditions. Def.'s Br. Summ. J., 5. DRHA also solicited Carnell's work directly through competitive bidding, unlike the other contractors on the Project. *Id.* at 3-4. Carnell's work was a vital piece of the Project and it is entitled to execute its federally funded work free from racial discrimination—a right it can protect through a Title VI claim.

### 3. The Contract's Notice and Dispute Resolution Procedures

Finally, DRHA argues that Carnell's Title VI claim is governed by the Contract's notice and dispute resolution procedures, which Carnell did not follow. (D's Brief in Support, 27.) The Contract requires, *inter alia*, that all Contractor claims be submitted to the "Contracting Officer" for consideration. HUD General Conditions Section 29(i). Under the HUD, the Contracting Officer is a member of the public housing authority (here, DRHA). Id. at Section 1(c). Thus, if Carnell's Title VI claim is covered by the Contract's dispute resolution procedures, it would put

DRHA in the position of both defending and adjudicating Carnell's discrimination allegations. This result is not consistent with the twin goals of Title VI, discussed above.

DRHA cites *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) and *Kordize v. Fannie Mae Corp.*, 593 F.Supp.2d 863 (E.D. Va. 2009) in support of its contention that contractual procedures are enforceable with respect to discrimination claims, but those cases are distinguishable from the case at bar. In *Gilmer*, the United States Supreme Court considered the applicability of an arbitration agreement that covered "any controversy . . . arising out of the employment or termination of employment" as it related to Plaintiff's claim under the Age Discrimination and Employment Act. *Gilmer*, 500 U.S. at 23. Clearly, an ADEA claim falls under the language in the arbitration agreement. Likewise, in *Kordize*, the Court held that Plaintiff's Title VII claim was subject to a contractual agreement to arbitrate, which required that the arbitration "be held in [the] City of Arlington, Virginia[,] in accordance with the Commercial Arbitration Rules . . . of the American Arbitration Association . . . ." *Kordize*, 593 F.Supp.2d at 865.

The Plaintiffs in *Gilmer* and *Kordize* retained adequate forums for enforcing their rights. While the HUD procedures in this case do allow for the claim to proceed to a higher level of arbitral review, the fact that DRHA's argument would put it in the position of judging a discrimination claim against itself demonstrates that the notice and dispute resolution procedures in the Contract were never intended to control discrimination claims.

b. *The Merits of Carnell's Title VI Claim*

Title VI claims "are appropriately analyzed under the Title VII proof scheme," through either (1) the "ordinary principles of proof using any direct or indirect evidence relevant . . . and sufficiently probative," or (2) "the burden shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Middlebrooks v. University of Maryland*, 166 F.3d 1209, *4 (4th

Cir. 1999) (table decision) (citing *Preston v. Virginia ex rel New River Comm. College*, 31 F.3d 203, 207, 208 (4th Cir. 1984); *Diamond v. Bea Maurer, Inc.*, 128 Fed.Appx. 968, 971 (4th Cir. 2005); *see also Guardians Assoc. v. Civil Serv. Comm. of City of N.Y.*, 463 U.S. 582 (1983) (Marshall, J. dissenting) (noting that to make out a Title VI claim one must analyze the proof elements of Title VII). Further, "it appears that a majority of the Court believe that Title VI requires a showing of intentional discrimination as a prerequisite to an award of any sort of 'compensatory damages' to a private litigant in a Title VI case." *Love v. Duke University*, 776 F.Supp. 1070, 1072 (M.D.N.C. 1991) (citing *Eastman v. Virginia Polytechnic Inst. and State Univ.*, 939 F.2d 204 (4th Cir. 1991) *overruled on other grounds*, *Guardians Assoc.*, 463 U.S. at 607, n. 27.

The exact *McDonnell Douglas* test is not applicable to the facts of this case because it focuses on an employer/employee relationship, whereas here the focus is on a corporation serving as an independent contractor. Thus, in order to survive summary judgment on its Title VI claim for damages, Plaintiff must show either (1) direct evidence of intentional discrimination, or (2) the "ordinary principles of proof using any direct or indirect evidence relevant . . . and sufficiently probative." *Diamond v. Bea Maurer, Inc.*, 128 Fed.Appx. 968, 971 (4th Cir. 2005). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995), *reversed on other grounds* (quoting *Bodenheimer v. PPG Indus., Inc.*, 5F.3d 955 (5th Cir. 1993). Stray remarks will not be deemed direct evidence of discrimination. *Id.* at 548-49. The only direct evidence which Plaintiff references is the email exchange between Wasson and Ulbing, where the latter wrote, "[i]t has been my experience that minority contractor's don't tend to pay their labor as highly. It may be because of their desire to compete, or just traditional acceptance of lower wages, but in my

opinion this is historically correct." Def.'s Br. Summ. J., 4.  While this statement may be insensitive, there is little evidence of actual racial animus.  Ulbing leads his observation with the phrase, "[p]lease don't take this the wrong way," and also cites other reasons for Carnell's low bid, such as reduced mobilization costs because Carnell had another project nearby.  Ulbing Email, 1, ECF No. 58-12.  Most importantly, though, Ulbing's comments were made in the context of *awarding* Carnell the bid and telling Wasson that Ulbing believed Carnell's low bid was responsible.  *Id.* at 1-2.

The circumstantial evidence that Plaintiff provides is more extensive.  Reading the facts most favorably to Carnell, it appears that, "DRHA . . . imposed requirements on Carnell that were not imposed on other contractors," including requiring licenses that "were not needed, requiring 100% payment and performance bond" while allowing another contractor to proceed on a 10% letter of credit, rejecting Carnell's payroll format which was identical to others that DRHA accepted, and retaining 10% of Carnell's payment while only retaining 5% from other contractors (specifically, Commodore).  Ulbing Dep. 104, 129-33, 178; Michael Scales Dep. 329-30; Pl.'s Br. Opp. Summ. J., 9.  Moreover, Carnell complained to Wasson of this disparate treatment "at least five or six" times between October, 2008, and May, 2009.  Wasson Dep. 71.  Although Wasson met with Ulbing to discuss Carnell's complaints, he did not inform DRHA's Board of Commissioners, though he did seek legal counsel.  Wasson Dep. 73-75, 82-83.  Following a December 2008 meeting where Carnell complained of discriminatory treatment, Ulbing called Michael Scales and told him to come to a follow-up meeting days later if Carnell "wanted to keep its job."  Ulbing Dep. 224, Michael Scales Dep. 134-35.  At that follow-up meeting, DRHA came with a letter in hand to terminate Carnell (Ulbing Dep. ex. 16), although the meeting concluded without that happening.  Ulbing Dep. 225-26.  According to Carnell, then, "just hours after [it] complained of race discrimination, DRHA formed the intention to terminate

Carnell for default." Pl.'s Br. Opp. Summ. J., 19. Ulbing also testified that he heard an employee of another contractor repeatedly use the "n" word, but did nothing to address the conduct. Ulbing Dep. 32-39. In May, 2009, Carnell complained directly to DRHA's Board of Commissioners, which had not heard of Carnell's previous protestations of discrimination. Wasson Dep. 98-99. Soon thereafter, the parties' contractual relationship ended, and eventually the present litigation commenced.

DRHA, in turn, has offered some race-neutral explanations for its treatment of Carnell. Concerning the disparate retainage, DRHA states that it was a "management decision" and notes, "Commodore and Carnell performed different tasks under their respective contracts; Carnell was responsible for the Site Work while Commodore was responsible for the Building Work . . . the performance of different contracts providing for different retainage" Def.'s Br. Summ. J., 46. Moreover, Commodore negotiated with Cornerstone for its contract, whereas Carnell worked with DRHA. *Id.* Different contracts between different parties may vary in terms on issues such as retainage, DRHA argues. Likewise, the letter of termination DRHA considered giving Carnell in the December 12 meeting is full of race-neutral reasons for DRHA's dissatisfaction with Carnell's performance and, most importantly, that letter was never delivered.

Regarding Plaintiff's other claims, though, DRHA either does not address them, argues that there is insufficient evidence to support them in the record, or that they do not correspond with an adverse action. Def.'s Br. Summ. J. 28-32. Regarding matters of proof, Plaintiff has provided a citation to, at minimum, sworn testimony supporting the claims I listed above. I take those evidenced allegations as true for purposes of summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, as a *McDonnell Douglas* analysis does not fit the facts here, it is not at all clear that a direct link between each instance of alleged discrimination and an adverse action is necessary. What is clear, for summary judgment purposes, is that

Carnell has alleged that it was the victim of race discrimination in violation of Title VI, that Carnell has provided evidentiary support for its claims, that DRHA has provided race-neutral explanations for only a small number of those claims, and that DRHA adversely ended its contractual relationship with Carnell before Carnell's work was complete. As such, I find that genuine issues of material fact exist regarding Plaintiff's Title VI claim such that reasonable jurors could find by a preponderance of the evidence that Carnell is entitled to a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## V. CONCLUSION

For the reasons stated above, I will **GRANT** in part and **DENY** in part Defendants' Motions for Summary Judgment. The VPPA sets a statutory ceiling on what Carnell may recover under the Contract, but in all other aspects, Plaintiff's claims may proceed.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 25th day of January, 2011.

s/Jackson L. Kiser
Senior United States District Judge