IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CARNELL CONSTRUCTION CORP., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANVILLE REDEVELOPMENT & | ) | |
| HOUSING AUTHORITY, | ) | Case No. 4:10CV00007 |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BLAINE SQUARE, LLC, | ) | |
| | ) | By: Jackson L. Kiser |
| Defendant/Counterclaim Plaintiff, | ) | Senior United States District Judge |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL FIDELITY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

Before me is Defendant/Counterclaim Plaintiff Danville Redevelopment & Housing

Authority's and Defendant/Counterclaim Plaintiff Blaine Square, LLC's Motion for Judgment as

a Matter of Law or, in the Alternative, Motion for a New Trial (ECF No. 208) pursuant to

Federal Rules of Civil Procedure 50(b) and 59(a)(1)(A).  The parties filed supporting and

opposing briefs to the motion and I heard oral argument on April 12, 2011.  The matter is now

ripe for decision.  For the reasons stated below, I will **DENY** Defendants' Motion for Judgment

as a Matter of Law and **GRANT** Defendants' Motion for a New Trial.  All other pending

motions are **OVERRULED AS MOOT**.

1

## I. Facts and Procedural History

The facts of this case are detailed in my January 27, 2011 Amended Memorandum Opinion (ECF No. 127) and my January 27, 2011 Memorandum Opinion (ECF No. 131). To summarize, Carnell Construction Company ("Carnell"), as the low bidder on a publicly bid construction contract ("the Contract"), agreed with the Danville Redevelopment & Housing Authority ("DRHA") to perform grading work on Phase 4 of the Blaine Square Hope VI Project ("the Project") in Danville, VA. The United States Department of Housing and Urban Development ("HUD") provided partial funding for the Project. DRHA assigned its interest in the contract to Blaine Square, LLC ("Blaine Square"), though DRHA continued to manage the Project. Counterclaim Defendant International Fidelity Insurance Company ("IFIC") issued Carnell its Performance Bond ("the Bond") on June 4, 2008, thereby acting as Carnell's surety on the Project. As the Project progressed, Carnell's costs exceeded expectations and the parties encountered numerous delays. Carnell and DRHA accused each other of breaching the Contract and Carnell accused DHRA of racial discrimination in violation of Title VI. IFIC echoed Carnell's arguments and asserted that DRHA was barred from making a claim against the bond.

On February 17, 2011, after eight days of trial, the jury returned a verdict against DRHA in the amount of $3,168,341.14. All of Plaintiff's awarded damages stemmed from the jury's finding that DRHA was liable under Title VI for intentional racial discrimination. The jury also found that Carnell, DRHA and Blaine Square all breached the contract but did not award damages under those claims. The jury found in favor of IFIC on DRHA's counterclaim against the Bond.

## II. Standard of Review

Under Rule 50(b), the district court should grant a motion for judgment as a matter of law

if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998); *Givens v. O'Quinn*, 447 F.Supp.2d 593, 596 (W.D. Va. 2006); *Szedlock v. Tenet*, 139 F.Supp.2d 725, 729 (E.D. Va. 2001). In general, "a jury verdict is 'permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award . . . .'" *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004).

> In assessing whether this standard has been met, a court should not attempt to substitute its judgment for the jury, weigh the evidence, or pass on the credibility of witnesses. Instead, the evidence must be construed in the light most favorable to the party against whom the motion is made, giving that party the benefit of all inferences.

*Szedlock*, 139 F.Supp.2d at 729 (citations omitted). "Thus, the moving party bears a 'hefty burden' in establishing that the evidence is insufficient to uphold the jury's verdict." *Price v. City of Charlotte*, 93 F.3d 1241, 1349 (4th Cir. 1996) (citation omitted).

Rule 59(a)(1)(A) provides for the grant of a new trial upon a party's motion "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Fourth Circuit has provided a more detailed framework:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Sys. and Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Cas. & Surety Co. v. Yeatts*, 122 F.2d 350, 352–53 (4th Cir. 1991). When considering a Rule 59(a) motion, unlike a Rule 50(b) motion, the Court is "permitted to weigh the evidence and consider the credibility of witnesses." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citing *Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)). "The decision to grant or deny a new trial is within the sound discretion of the district court, and we

respect that determination absent an abuse of discretion."  *Id.*

## III.  Summary of Arguments

In their 84-page brief[1], Movants advance a host of arguments.  DRHA and Blaine Square contend they are entitled to judgment as a matter of law because (1) "Carnell failed to present sufficient evidence of intentional race discrimination"; (2) "Carnell failed to comply with the notice and dispute resolution clauses of contract [sic]"; (3) "Carnell is not a person under Title VI"; (4) Title VI does not support the type of damages the jury awarded; and, (5) "Carnell is not an intended beneficiary under Title VI."  Defs.' Br. JAML/New Tr. at 45, 76, 79.  In the alternative, DRHA and Blaine Square contend that they are entitled to a new trial because (1) "Carnell's witnesses gave false evidence"; (2) Plaintiff's evidence on damages under Title VI was inadmissible; (3) Plaintiff's evidence on damages under Title VI did not support the jury's verdict; (4) the jury was improperly selected; (5) the jury was improperly maintained; (6) the jury was "poisoned" by Plaintiff's counsel's "improper comments"; (7) the jury was improperly instructed; (8) the jury's verdict is inconsistent; and, (9) the evidence relating to McGuireWoods Consulting should have been admitted in its entirety.  *Id*. at 3, 8, 23, 80.

In addition to disputing Defendants' motion on the merits, Plaintiff contends Defendants' arguments regarding the kind of damages recoverable under Title VI, the verdict's alleged inconsistency, and the threshold barriers to Plaintiff's Title VI recovery were not raised at trial and are, therefore, waived.  Pl.'s Br. Opp. JMAL/New Tr. at 45, 66.

## IV.  Analysis

### A.  Judgment as a Matter of Law under Fed. R. Civ. P. 50(b).

---

[1]  This case has suffered from excessive briefing.  The parties' briefs supporting and opposing pre- and post-trial motions alone total 660 pages, not including attachments.  With attachments—which do *not* include full deposition transcripts—that number increases to 3,179 pages.  Many individual briefs exceed 50 pages.  The absence of a page limit in the Western District is not intended as an invitation for protracted argument.  As the Fourth Circuit recently stated, "wisdom may reside in recognizing that less is sometimes more and that zealous advocacy need not always part company with forbearance and restraint."  *Waybright v. Frederick Cnty.*, 528 F.3d 199, 210 (4th Cir. 2008).  Put more succinctly, "brevity is the soul of wit."  SHAKESPEARE, HAMLET, act 2, sc. 2.

1. Sufficient Evidence.

To satisfy its burden under Rule 50(b), Defendants must establish that Plaintiff failed to provide a legally sufficient evidentiary basis such that a reasonable jury could conclude that Defendants intentionally discriminated against Plaintiff in violation of Title VI and, as a result, Plaintiff suffered adverse consequences.  *See Lewis v. Amherst Cnty. Sch. Bd.*, 151 F.3d 1029, *5, n.2 (4th Cir. 1998) (Table) (affirming summary judgment under Title VI because Plaintiff failed to prove that Defendants' action was racially "motivated."); *Thompson By and Through Bruckhanon v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998) ("To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct.").  As the Sixth Circuit has stated:

> [T]o avoid summary judgment on a claim under [Title VI], a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race.  To establish a genuine issue of material fact that the defendants intentionally discriminated against [Plaintiff] on the basis of his race, plaintiff must demonstrate that the decision to exclude [Plaintiff] from a federally financed program was motivated by race and that his race was *a* determining factor in the exclusion.  In other words, proof of discriminatory intent is critical.

*Buchanan v. City of Bolivar, Tenn.*, 93 F.3d 1352, 1356 (6th Cir. 1996) (emphasis added); *see also Gierlinger v. Gleason*, 160 F.3d 858, 868 (2d Cir. 1998) (noting that, under Title VI, "plaintiff's burden is to show that that the impermissible factor was a 'substantial' or 'motivating factor' in her adverse treatment.  She is not required to show that the impermissible factor dwarfed all other factors.").

More specifically, Title VI claims "are appropriately analyzed under the Title VII proof scheme . . . ."  *Middlebrooks v. Univ. of Maryland*, 166 F.3d 1209, *4 (4th Cir. 1999) (Table).

> [A] Title VII plaintiff my 'avert summary judgment . . . through *two* avenues of proof.' . . .  A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a

> genuine issue of material fact as to whether an impermissible factor such
> as race motivated the employer's adverse employment decision. . . .
> Alternatively, a plaintiff may 'proceed under [the *McDonell Douglas*]
> 'pretext framework, under which the employee, after establishing a
> prima facie case of discrimination, demonstrates that the employer's
> proffered permissible reason for taking an adverse employment action is
> actually a pretext for discrimination.'

*Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).  As I stated in

my Amended Memorandum Opinion ruling on the pre-trial summary judgment motions, "[t]he

exact *McDonnell Douglas* test is not applicable to the facts of this case because it focuses on an

employer/employee relationship, whereas here the focus is on a corporation serving as an

independent contractor."  Amended Memorandum Opinion, ECF No. 127 at 23.  Nevertheless,

the general structure of *McDonnell Douglas*' burden shifting scheme is workable under the facts

and the parties appear to have employed it in their arguments.  Plaintiff can also use "ordinary

principles of proof using any direct or indirect evidence relevant . . . and sufficiently probative."

*Diamond v.Bea Maurer, Inc*., 128 Fed.Appx. 968, 971 (4th Cir. 2005).

After a thorough review of the record, reading the evidence in the light most favorable to

Plaintiff, I find that Plaintiff did provide a sufficient evidentiary basis such that a reasonable jury

could conclude that Defendants intentionally discriminated against Plaintiff in violation of Title

VI and, as a result, Plaintiff suffered adverse consequences.  The following examples evidence

such discriminatory intent and adverse impact and support the jury's finding.[2]

a.  Disparate Treatment

Among Plaintiff's many allegations of disparate treatment are the following examples:

(1) DRHA pre-paid another contractor for materials before it started work without providing

Carnell the same opportunity; (2) DRHA withheld ten percent retainage from Carnell and only

---

[2]     The selection of these particular instances does not, by way of negative implication, reflect a judgment by
the Court that the omitted instances of alleged discrimination are unsupportive of the jury's findings.  The
instances discussed in this Opinion provide an ample evidentiary basis for a reasonable jury's conclusion that
Defendants are liable and this determination is made without comment on the merits of Plaintiff's other
allegations.

five percent from other contractors; (3) DRHA denied Carnell's change order requests and pay applications while granting the same from other contractors. Pl.'s Br. Opp. JAML/New Tr. 37.

Initially, defendants argue that comparing Carnell with other contractors on the Project is inappropriate because Carnell was not similarly situated; Carnell's contract was the only one subject to a public bidding process. Defs.' Rep. Br. JAML/New Tr. 38, 39, 41, 45, 48, 50. Plaintiff retorts that "Carnell and Commodore[3] were both working for the same entity at the same time on the same project—and reporting to the same Hope VI Director . . . ." Pl.'s Br. Opp. JAML/New Tr. at 36 n. 22. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George v. Leavitt*, 407 F.3d 405, 414 (D.C. 2005) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Given the similarities Plaintiff observes, I cannot say that, as a matter of law, the other contractors were not similarly situated; further, a reasonable jury could have found that Carnell was similarly situated with other contractors on the project.

Defendants offer non-discriminatory business reasons for each of Plaintiff's claimed instances of discrimination. *See* Defs.' Br. JAML/New Tr. at 46–76. Regarding the pre-payment of materials, Defendants cite DRHA's CEO, Gary Wasson's ("Wasson") testimony at trial that the IRS required DRHA to spend a certain amount of money by a certain deadline and that Commodore's cost requirements were prepared by that deadline whereas Plaintiff's were not. *Id.* at 71. Regarding retainage, Defendants cite DRHA's Hope VI Director Cedric Ulbing's ("Ulbing") and Wasson's testimony from trial that they retained ten percent from Carnell because that was a requirement under HUD regulations (also known as the "HUD 5370"), which was a part of Plaintiff's and DRHA/Blaine Square's contract. *Id.* at 67. Wasson further testified that Commodore's five percent retainage figure had been negotiated prior to Defendants

---

[3]     Commodore Homes ("Commodore") was the building contractor on the Project.

assuming Commodore's contract, which Defendants assumed "as is," despite the fact that Commodore's contract also incorporated the HUD 5370. *See id.* ("Wasson testified that it was that it was his understanding that, Cornerstone,[4] as a private developer, had the ability to negotiate the retainage to five percent . . . ."). Finally, regarding pay requests, DRHA argues that Carnell's work was unsatisfactory and that "each such decision was based on [the Project's engingeer's] recommendation." Defs.' Rep. Br. JAML/New Tr. 51.

Plaintiff attempts to rebut each of Defendants' non-discriminatory reasons in an effort to show that Defendants' explanations are pretextual. Whereas Defendants' witness initially testified that the pre-payments to Commodore had to be made by June, 2008 to qualify for tax benefits, those payments were not actually made until a month later. Pl.'s Br. Opp. JAML/New Tr. 24. Further, Defendants' witness testified that they could not pre-pay Carnell "for grading costs that they hadn't done yet" whereas they could pre-pay Commodore for supplies needed to build homes Commodore hadn't built yet. Trial Tr. 2/9/11 148–49. In other words, Defendants appeared to testify that Carnell did not require supplies in advance, which made Commodore a better candidate for pre-pay. "Given that Carnell was responsible for putting in such items as piping, driveways, sidewalks, filterra units and grass," Plaintiff argues that Defendants' non-discriminatory explanation is, itself, "inexplicable." Pl.'s Br. Opp. JAML/New Tr. 24. As to the different levels of retainage, Plaintiff attempts to show pretext by highlighting three facts: (1) Wasson testified that HUD 5370 was "just as much a part of Commodore's contract as it was Carnell's"; (2) "Cornerstone specifically told Ulbing that the retainage on Commodore's contract should be ten percent; and (3) irrespective of Cornerstone's status as a private party, "Carnell and Commodore had contracts with the same party (Blaine Square, LLC) at all times on the project." *Id.* at 26. Finally, regarding the denial of pay applications and Defendants' accusations

---

[4]     Cornerstone was DRHA's developer on the Project.

of unsatisfactory work, Plaintiff first observes that "[i]t was only after Carnell complained of racial discrimination that its pay applications were not approved," and "Carnell was the only contractor whose change order requests were rejected and whose monthly pay applications were either rejected or reduced. *Id.* at 31. Moreover, Plaintiff observes Defendants initially certified as satisfactory much of the work Defendants now claim was inadequate. *Id.* at 22.[5] I find that Plaintiff has satisfied its burden of offering evidence of pretext specifically refuting the facts which support Defendants' nondiscriminatory reasons for disparate treatment. *DeJarnette v. Corning Inc.*, 133 F.3d 293 (4th Cir. 1998). Defendants' lengthy argument would have me invade the province of the jury and, in effect, re-weigh the witnesses' credibility—an endeavor in which I cannot and will not engage. *Berry v. United States*, 312 U.S. 450 (1941).

b. Complaints of Racism

Michael Scales ("M. Scales"), Carnell's President, testified that after encountering the aforementioned disparate treatment, he requested a meeting with Wasson and Linwood Terry, who is DRHA's Maintenance Director and is African-American. Trial Tr. 2/7/11 200. Wasson did not invite Terry to the meeting, which took place on December 10, 2008. Trial Tr. 2/7/11 211. M. Scales testified that he complained of race discrimination at the meeting directly to Wasson. Trial Tr. 2/7/11 134, 204, 198. At his deposition, Wasson likewise stated that M. Scales complained to him about racial discrimination at that meeting. Trial Tr. 2/8/11 206–09, 218; 2/9/11 176. After his deposition, though, Wasson executed an errata sheet which stated that M. Scales did not complain to him about racial discrimination. Trial Tr. 2/8/11 216–17; 2/9/11 176. At trial, Wasson testified that he should have realized, but failed to understand, that M. Scales' complaints at the meeting were about race discrimination. Trial Tr. 2/9/11 116. Nonetheless, Wasson sought legal counsel soon after the meeting with M. Scales but did not

---

[5] Wasson and DRHA's engineer signed HUD documents under penalty of prosecution that over 90 percent of Carnell's work was satisfactory. Trial Ex. P-52; Trial Tr. 2/11/11 210.

relay any of M. Scales' complaints to DRHA's board of directors ("the Board"). Trial Tr. 2/8/11 214–15. Finally, Wasson testified that the Board got upset with him for not informing it about M. Scales' race discrimination complaint. Trial Tr. 2/8/11 223–24. The preceding testimony led to the following exchange:

> Plaintiff's Counsel: Sir, my point is it is your testimony that the board voiced concern about you not telling them about a racial discrimination complaint that was nonexistent; that's what you are telling us; right?
>
> Wasson: Yes.

Trial Tr. 2/8/11 225. Soon after the meeting between Wasson and M. Scales, DRHA threatened to fire Carnell. Trial Tr. 2/7/11 206–07, 211–13; 2/8/11 202; 2/10/11 102, 144–45. A reasonable jury could have found that Wasson's testimony was contradictory and that Wasson lacked credibility. Defendants admit in their brief that "Carnell may have proved that Wasson covered up a complaint of race discrimination," but argue that "Carnell failed to prove Wasson covered up any discriminatory treatment." Defs.' Br. JAML/New Tr. at 42. Notwithstanding the evidence of discrimination discussed above, it is well-settled law that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993).

### c. Termination Stories

At various stages in this litigation, viewing the facts in the light most favorable to Plaintiff, DRHA has asserted that (1) Carnell's contract "expired"; (2) Carnell was terminated for default pursuant to Article 32 of the HUD 5730 general conditions; and, (3) Carnell was not terminated for default. Trial Tr. 2/9/11 85–91, 88–89, 99–100, Trial Ex. C-35. Despite the

extraordinary length of their Briefs supporting the present motion, Defendants do not address the shifting explanations directly. They simply argue that they were justified in terminating Carnell because Carnell's work was unsatisfactory. Defs.' Br. JAML/New Tr. at 73. As the Fourth Circuit has repeatedly held, a Defendant's shifting explanations for an adverse employment action is probative of pretext. *See Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (noting that "it is 'permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation'") (quoting *St. Mary's Honor Ct.r v. Hicks*, 509 U.S. at 511); *Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 387 (4th Cir 2008) (same); *E.E.O.C v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001) (same) (citing *Burdine*, 450 U.S. at 253); *see also Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and *arguably* inconsistent explanations, a jury may infer that the articulated reasons are pretextual.") (emphasis added); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."); *E.E.O.C. v. Ethan Allen, Inc*, 44 F.3d 116, 120 (2d Cir. 1994) (holding that a reasonable juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, developed over time to counter the evidence suggesting discrimination).

## 2. Recoverable Damages Under Title VI

In *Barnes v. Gorman*, 536 U.S. 181 (2002), the Supreme Court discussed the available damages under Title VI. "Title VI invokes Congress's power under the Spending Clause, U.S. Const. , Art. I, § 8, cl. I, to place conditions on the grant of federal funds." *Barnes*, 536 U.S. at 185–86. The Court has frequently characterized Title VI and Spending Clause legislation generally as contractual in nature: "in return for federal funds, the recipients agree to comply with federally imposed conditions." *Id.* at 186 (citations omitted). The analogy is not exact,

though, as "we have been careful not to imply that *all* contract-law rules apply to Spending

Clause legislation." *Id.* While the contract-law analogy is most helpful in "defining the scope of

conduct for which funding recipients may be held liable for money damages," it is also useful "in

finding a damages remedy available in private suits under Spending Clause legislation." *Id.* at

186–87. As the Court stated in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1988),

"Title IX's contractual nature has implications for our construction of the scope of available

remedies." *Gebser*, 524 U.S. at 287.

   One of the implications of the contract-law analogy, the Court reasoned in *Barnes*, "is

that a remedy is 'appropriate relief,' only if the funding recipient is *on notice* that, by accepting

federal funding, it exposes itself to liability of that nature." *Barnes*, 536 U.S. at 187.

Consequently, under Title IX—which, like Title VI, has an implied private right of action—the

Court has held that "a recipient of federal funds is . . . subject to suit for compensatory damages

and injunction, forms of relief traditionally available in suits for breach of contract." *Id.*

(citations omitted). In *Barnes*, the Court held that Title VI could not support punitive damages,

which, "unlike compensatory damages and injunction, are generally not available for breach of

contract." *Id.*

> We have acknowledged that compensatory damages alone 'might well
> exceed a recipient's level of federal funding,' *Gebser,* [524 U.S.] at 290 .
> . . ; punitive damages on top of that could well be disastrous. Not only is
> it doubtful that funding recipients would have agreed to exposure to such
> unorthodox and indeterminate liability; it is doubtful whether they would
> even have *accepted the funding* if punitive damages liability was a
> required condition. . . . In sum, it must be concluded that Title VI
> funding recipients have not, merely by accepting funds, implicitly
> consented to liability for punitive damages.

*Id.* at 188. In closing, the Court provided a broader guiding principle:

> When a federal-funds recipient violates conditions of Spending Clause
> legislation, the wrong done is the failure to provide what the contractual
> obligation requires; and that wrong is "made good" when the recipient
> *compensates* the Federal Government or a third-party beneficiary . . . for

the loss caused by that failure.

*Id.* at 189.

As an initial observation, Plaintiff and Defendants appear to agree that the damages awarded at trial relate to reputation, good will, integrity, and lost business opportunities. Plaintiff argues that such damages are included in the traditional definition and scope of compensatory damages, "which includes damages for both pecuniary and nonpecuniary injuries." Pl.'s Br. Opp. JAML/New Tr. at 46. Defendants argue that "[i]t is well established under contract law that damages for harm to reputation are not recoverable." Defs.' Rep. Br. JAML/New Tr. at 13.

Defendants are correct that damages for injury to reputation are unavailable in a breach of contract action. *See, e.g.*, *O'Leary v. Sterling Extruder Corp.*, 533 F.Supp. 1205 (E.D. Wis. 1982) (noting that "the courts seem to be in general agreement that damages for injury to reputation are not properly awardable in a breach of contract suit" and providing a string citation of support). The Fourth Circuit has so held in *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 288 (4th Cir. 2000), in a case where it was applying West Virginia law. The Virginia Supreme Court also affirmed this principle recently in *Isle of Wight Cnty. v. Nogiec*, 704 S.E.2d 83 (Va. 2011). Because Plaintiff's damages evidence "was based entirely on Carnell's claimed injury to its reputation and its claimed loss of future business opportunities with VDOT," Defendants argue that those damages are barred based on the contract-law analogy employed in *Barnes*. Defs.' Rep. Br. JAML/New Tr. at 12.

Plaintiff retorts that, "[i]f DRHA's argument were accepted, victims of discrimination under Title VI, the ADA, the Rehabilitation Act, and Title IX would never be entitled to monetary damages for untraditional breach of contract remedies such as emotional distress." Pl.'s Br. Opp. Defs.' Mot. JAML/New Tr. at 47. Plaintiff then cites a number of cases where

federal courts have allowed recovery for emotional distress in Title IX and Rehabilitation Act cases[6]—which are coextensive with Title VI[7]—and concludes, "it follows that damages for other non-pecuniary injuries such as loss of reputation and lost profits are permissible" if the funding recipient is on notice that it is exposed to that kind of liability. *Id.* at 49. Because "DRHA should have foreseen that intentionally discriminating against Carnell could harm Carnell's name, reputation and good will," Defendants were on notice and reputation damages are appropriate, argues Plaintiff. *Id.*

In *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007), the Eleventh Circuit held that non-economic compensatory damages are available for intentional violations of the Rehabilitation Act. *Sheely*, 505 F.3d at 1206. The Eleventh Circuit noted that, while "some federal courts of appeals had previously considered the availability of emotional damages under the RA . . . we know of none that has done so since *Barnes*." *Id.* at 1190 n. 17.

*Sheely* involved a legally blind plaintiff aided by the use of a seeing-eye dog. *Id.* at 1178. Plaintiff accompanied her minor son to a diagnostic imaging facility for his MRI appointment. *Id.* at 1179. Plaintiff was not allowed to accompany her son past the waiting room because the facility would not permit Plaintiff to bring her dog. *Id.* Plaintiff initiated the lawsuit soon after. *Id.*

The Eleventh Circuit seized on the link between the Rehabilitation Act and Title VI,

---

[6]   *See, e.g., Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 384 (W.D. Pa. 2008) (holding that "a [federal] funding recipient has sufficient notice that its violation of its obligations under Title IX could lead to emotional distress in the subjects of such violation, and that recovery for emotional distress is not automatically foreclosed in the instant case"); *Doe v. Dist. of Columbia*, 796 F. Supp. 559 (D.D.C. 1992) (Rehabilitation Act case allowing for compensatory damages, including emotional distress); *see also Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 157 n.5 (11th Cir. 1994) ("it is well-established that Congress intended the same remedies be available under Title IX and Title VI" (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 594 (1983) (White, J., plurality))); *see also Restatement (Second) of Contracts* § 353 (1981) (allowing recovery for emotional disturbance where "the breach is of such a kind that serious emotional disturbance was a particularly likely result"); 24 Samuel Williston, *A Treatise on the Case Law of Contracts* § 64:7 (4th ed. 2002; updated 2008) (suggesting that "perhaps a majority of courts would today follow the Restatement (Second)[]"; noting that there are "numerous cases allowing" recovery; and further noting that such cases "invariably deal[] with … peculiarly sensitive subject matter, or noncommercial undertakings or both").

[7]   *Barnes*, 536 U.S. at 185.

stating, "in determining whether emotional damages are available under § 504, we must ask what remedies the Supreme Court has allowed a private litigant suing under Title VI to recover, and why." *Id.* at 1191. The court began its analysis by observing four principles: (1) "the Supreme Court has repeatedly held that where legal rights have been invaded and a cause of action is available, generally a federal court may use *any* available remedy," a presumption that will yield "*only* to a contrary congressional intent or statutory purpose"[8]; (2) the Supreme Court's contract-law analogy from *Barnes*; (3) the Supreme Court's distinction between intentional and unintentional violations of Spending Clause statutes; and (4) the Supreme Court's ban on punitive damages under Title VI. *Id.* The court then embarked on an extensive evaluation of the precedent behind those four principles, and arrived at the following conclusion:

> When an entity accepts funding from the federal government, it does so in exchange for a promise not to discriminate against third-party users of its services. A foreseeable consequence of discrimination is emotional distress to the victim, and emotional damages have long been available for contract breach in the public accommodations context. Thus, where one of the benefits the government has bargained for is the funding recipient's promise not to discriminate, the recipient cannot claim to lack fair notice that it may be liable for emotional damages when it intentionally breaches that promise. The Supreme Court's concern with notice in awarding remedies for violations of Spending Clause legislation—which operates as a constraint on the *Bell v. Hood* presumption—is thus satisfied, and we are obliged to adhere to *Bell*'s presumption that we may award "any available remedy to make good the wrong done." In short, we conclude that emotional damages are available to make whole the victims of violations of § 504 of the Rehabilitation Act, and accordingly, we reverse the district court.

*Id.* at 1204. I am persuaded by the Eleventh Circuit's reasoning and find it applicable to the damages in the case at bar. Therefore, I conclude that Plaintiff's damages are recoverable under Title VI.

### 3. Remaining Rule 50(b) Matters

In my pre-trial Amended Memorandum Opinion, I addressed and ruled on Defendants'

---

[8] *Bell v. Hood*, 327 U.S. 678 (1946).

remaining grounds[9] for Judgment as a Matter of Law under Rule 50(b). Specifically, I held that "Carnell has standing to bring its claim for intentional race discrimination pursuant to Title VI, its corporate identity notwithstanding"; "Carnell's work was a vital piece of the Project and it is entitled to execute its federally funded work free from racial discrimination—a right it can protect through a Title VI claim"; and, "DRHA's argument [regarding the contract's dispute resolution procedures] would put it in the position of judging a discrimination claim against itself [which] demonstrates that the notice and dispute resolution procedures in the Contract were never intended to control discrimination claims." Amended Memorandum Opinion, ECF No. 127 at 18, 21, 22. I see no reason to disturb those holdings post-trial.

### B. Motion for New Trial Under Rule 59

#### 1. False Evidence

##### a. Facts

M. Scales provided the following testimony at trial: ". . . approximately 99 percent of our work is public work, so, yes, . . . without a performance bond capabilities we not be able to work [sic]." Trial Tr. 2/7/11 196. M. Scales testified that Carnell's work consists "primarily of VDOT projects." Trial Tr. 2/7/11 130. M. Scales also noted that there was an upcoming project for VDOT "on Route 220 that we won't be able to bid because we don't have the bonding . . ." Trial Tr. 2/8/11 90. In summary, M. Scales testified, "We have lost our bonding capabilities, which means we cannot [bid] on any more projects." *Id.*

Further, Vincent Scales ("V. Scales") also testified as follows:

Q. "And to do VDOT work, do you have to be bonded?"

A. "Yes."

---

[9] That Carnell lacks standing due to its corporate status; that Carnell is not an intended beneficiary of the federal funds at issue here; and, that Carnell did not comply with the contract's notice and dispute resolution procedures.

Q. "Is it possible to do VDOT work without a bond?"

A. "No, not on the type of jobs that we were doing."

Trial Tr. 2/10/11 32. V. Scales also stated that DRHA's actions "destroyed us." Trial Tr.

2/10/11 75. "It has put us out of business." *Id.* "We have—we cannot bid on any more work.

We don't much [sic] any more bonding." *Id.*

In its brief for the present motions, DRHA and Blaine Square provide an affidavit from

Donald Silies ("Silies"), VDOT's State Contract Engineer in the Scheduling and Contracts

division. Silies Aff. ¶ 1. Silies provided the following pertinent information:

> 2. Carnell Construction Corporation ("Carnell") is a contractor
> which, since September 24, 2007, has been awarded four VDOT jobs
> that involved a contract sum of less than $250,000.00 ("Small Jobs").
> Since September 24, 2007, Carnell has been awarded no jobs that
> required a performance bond.
> . . .
> 4. Contractors who perform Small Jobs are not required to give a
> Performance bond to secure performance of their obligation.
> . . .
> 6. Carnell remains in good standing with VDOT and remains on
> VDOT's prequalification list. Therefore, Carnell can continue to bid
> upon and be awarded Small Jobs with VDOT. Any inability of Carnell
> to obtain a performance bond would have no adverse effect on Carnell's
> eligibility to be awarded Small Jobs consistent with Carnell's past
> experience with VDOT.

Siles Aff. ¶¶ 2, 4, 6. Silies also discussed the Route 220 project, which M. Scales testified that

Carnell could not bid on due to their lack of bonding. Silies stated, "There were 5 bids received

on this project with the highest bid below $180,000. Carnell did not submit a bid. If Carnell had

submitted a competitive bid (below $250,000.00) a performance bond would not have been

required." *Id.* ¶ 5.

### b. Argument

Based on the apparent contradictions between the Scales brothers' testimony and the

Silies Affidavit, Defendants contend that the "testimony regarding Carnell's past performance of

VDOT work and its ability to continue to work with VDOT was clearly false." Defs.' Br. JAML/New Tr. at 7. Defendants also note that "[t]he weight the jury gave to the false testimony is evidenced by questions from them during the deliberations." *Id.* (referencing the question regarding bonding that the jury submitted to the Court during deliberations[10]). Consequently, Defendants assert "[b]ecause it is evident from the foregoing newly discovered evidence that both M. Scales and V. Scales, Carnell's agents and prime material witnesses, gave material false testimony, the Court <u>must</u> grant DRHA's and Blaine Square's motion for a new trial." Defs.' Br. JAML/New Tr. at 8 (emphasis original) (citing *Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995).

In response, Plaintiff first observes that Defendants' counsel and witnesses also argued and testified throughout the trial that performance bonds are required on public contracts. Pl.'s Br. Opp. Defs.' Mot. JAML/NEW TR. at 41. Plaintiff argues, "one of the key themes advanced by DRHA at trial was that performance bonds are required on public projects." *Id.* Plaintiff observes that DRHA's counsel stated, "[c]ontractors are required in these public projects, they are required to submit bonds," and that DRHA's witness Ulbing testified, "'[Carnell] could not do substantial work in the future' without a performance bond." *Id.* (citing Trial Tr. 2/7/11 117, Trial Tr. 2/10/11 182). Carnell also points to DRHA's project engineer's testimony "that a contractor's bid must be rejected as 'incomplete' if the contractor cannot provide a performance

---

[10] **Jury**: What does the law say about restoring a person/company's bond after a claim has been filed against it? Can the company be bonded?

**Court**: Please clarify your question? I'm not sure what you are asking.

**Jury**: Does the law allow CCC to get another performance bond since he has a formal complaint with the IFIC? What is it going to take for CCC to get bonded again?

**Court**: There is no law that either prevents or permits the bonding of CCC.

Jury Notes/Questions, CM/ECF No. 197.

bond.  *Id.* (citing Trial Tr. 2/11/11 39, 50).  Plaintiff contends, "[i]n view of this testimony, it

cannot possibly be argued that Carnell's evidence was false, much less that it affected the

outcome of the trial."  Further, Plaintiff argues, "[e]ven without Carnell's evidence on this point,

DRHA pointedly and repeatedly told the jury that bonds were ***'required'*** on public projects and

that Carnell could not even submit a bid without one."  *Id.* (emphasis original).

Irrespective of DRHA's argument and testimony at trial, Plaintiff continues, "Carnell's

evidence was accurate."  Plaintiff argues that the "small jobs" exemption for VDOT bonding

requirements—discussed above in Silies' Affidavit—"is not on a per job basis . . . if a contractor

is awarded an unbonded contract for $150,000, it cannot then bid another $150,000 job, because

the total . . . would exceed $250,000."[11]  *Id.* at 43.  Plaintiff also submits evidence that VDOT

sometimes requires bonds on "emergency contracts" priced lower than the traditional "small

jobs" bonding threshold.  *Id.* (citing M. Scales post trial Declaration ("Scales Decl.") ¶ 4).

Plaintiff then observes that Carnell performed "twelve VDOT jobs in the previous three years"

with a "combined contract value $4,891,664.94," of which, "over [86] percent ($4,224,837.44)

came from jobs in excess of $250,000."  *Id.*  In support of this factual assertion, Plaintiff cites a

post-trial Declaration of M. Scales and Plaintiff's trial exhibit 33.  *Id.* (citing M. Scales Aff., Pl.'s

Br. Opp. JAML/New Tr. ex. D).  This assertion appears to be irreconcilable with the facts in the

Silies' affidavit.  Silies stated that Carnell has only performed four VDOT jobs since 2007 and

that none of them required a bond.  Siles Aff. ¶¶ 2, 4, 6.

In addition, Plaintiff contends that, based on Defendants' argument and testimony at trial,

Defendants were well aware that "loss of bidding capacity can adversely affect a contractor's

good name."  *Id.* at 44.  Thus, "[b]ecause there is no basis to find that it affected the outcome of

---

[11]     Defendants dispute this characterization.  "Pursuant to Section 103.05 [of the VDOT Specifications], a
contractor who has been awarded an unbounded contract for $150,000 who has completed and been paid for
$50,000 of that work can bid another $150,000 job because 'their bid plus the <u>balance</u> of other unbounded
contracts [would not] exceed[] $250,000.'"  Defs.' Rep. Br. JAML/New Tr. at 5 (citing VDOT Specifications § 103.05)
(emphasis original).

trial, this argument cannot support DRHA's Rule 59 motion." *Id* at 43.

### c. Precedent

> A new trial should be granted where the court is reasonably well satisfied
> that the testimony given by a material witness is false; that without it, a
> jury might have reached a different conclusion; that the party seeking a
> new trial was taken by surprise when the false testimony was given and
> was unable to meet it or did not know of its falsity until after trial.

*Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 134 (6th Cir. 1990). While "the Fourth Circuit

has not precisely addressed the standard for granting a new trial based on the contention that the

jury verdict was based on false testimony," some of its district courts have adopted the *Davis*

test, as have other circuits. *Johnson v. Verisign, Inc.*, 2002 WL 1887527 at *12 (E.D. Va. 2002)

(applying *Davis*); *see also Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265, 279

(M.D.N.C. 2004) (same); *Hospira, Inc. v. Alpha and Omega Transp. Servs., Inc.*, 2007 WL

1825182 (W.D.N.C. 2007) (same); *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537

(7th Cir. 1993) (same); *Williams v. United Dairy Farmers, et. al.*, 188 F.R.D. 266 (S.D. Oh.

1999) (same).

In *Davis*, Plaintiff brought a medical malpractice claim against Defendants based on

Plaintiff's treatment following an automobile accident. *Davis*, 912 F.2d at 131. Plaintiff argued

that his doctor failed to timely diagnose a subdural hematoma, causing Plaintiff permanent brain

damage. Plaintiff's expert testified at trial that, despite the brain damage, Davis would have a

"normal life span." *Id.* at 132, 134. The jury returned a substantial verdict in Plaintiff's favor.

*Id.* at 132. Thirty-three days after the trial, and after judgment was entered but while post-trial

motions were still pending, Plaintiff died. *Id.* Defendant's moved for, *inter alia*, a new trial

under Rule 59, arguing that Plaintiff's evidence at trial regarding Davis' expected life span was

false. *Id.* at 132, 135. The Court was "unimpressed with this nearly frivolous argument" and

declined to adopt a rule that would "require reopening cases where a plaintiff's life span

exceeded the expectation presented to the jury." *Id.* at 134.

In *Johnson*, Plaintiff alleged he was the victim of racial discrimination and retaliatory termination for protected activity he engaged in opposing Defendants' discriminatory practices. *Johnson*, 2002 WL 1887527 at *2. During the pre-trial motions and at trial, Defendants presented affidavits and testimony that Plaintiff was part of a larger, nondiscriminatory work force reduction evidenced by frequent references to a "list of affected individuals by the layoff." *Id.* Despite these references, "Defendants failed to provide any list" nor "a single document identifying any of the [] employees who were laid off . . . ." *Id.* at *6. The Court issued a *sua sponte* post trial order for all documents relevant to the force reduction. *Id.* While Defendants did provide some correspondence indicating a large scale reduction during the relevant time period, there was no list as discussed in the sworn testimony. *Id.* Further, some of the lay-offs Defendants referenced in connection to Plaintiff happened in offices across the country, contrary to what the Court was led to believe. *Id.* at *7. The Court found that Defendants did present false testimony regarding the existence of a tangible layoff list which was material to the jury's deliberations. *Id.* at *15. The Court also concluded that the jury may have reached a different conclusion without the false evidence. "Defendants' consistent testimony about a written, tangible layoff list including the Plaintiff unquestionably bolstered the credibility of Defendants in a case where credibility was key." *Id.* at *16. Finally, the Court concluded that Plaintiff was unaware of the falsity of Defendants' testimony, because it "was not fully revealed until after Defendants complied with the" Court's *sua sponte* order. *Id.* at *17. Thus, the Court granted Plaintiff's Rule 59 motion for a new trial. *Id.*

### d. Analysis

After reviewing the relevant evidence, I am "reasonably well satisfied"[12] that M. Scales

---

[12]     *Davis*, 912 F.2d at 134.

and V. Scales—both material witnesses—gave false evidence. Don Silies is, as stated, the State Contract Engineer in VDOT's Scheduling and Contracts division and I afford great weight to his testimony regarding VDOT activities. I find that his account of Carnell's previous VDOT work and ability to do VDOT work in the future irreconcilable with the statements the Scales brothers gave at trial and in M. Scales' post trial Declaration. This finding satisfies the first prong of *Davis*.

As to the second prong of *Davis*, there can be little doubt that, absent the false testimony, the "jury might have reached a different conclusion." *Davis*, 912 F.2d at 134. One of the jury's main lines of inquiry with the Court during their deliberations concerned Carnell's future ability to obtain a bond. If the jury had known that much, if not all, of Carnell's previous VDOT work was unbonded, it is likely that the jury would not have awarded damages in the amount it did. Plaintiff's constant reference to Defendants' discussion of bonds at trial is a poor counter-argument. Much of the testimony Plaintiff cites was in the context of discussing International Fidelity Insurance Company's ("IFIC") role in the litigation. More importantly, I agree with Defendants that "these cited comments referred to public contracts generally and not VDOT projects specifically. Therefore, these general comments have no relevancy to the false testimony provided by Carnell." Defs.' Rep. Br. Mot. JAML/New Tr. at 4.

Finally, I conclude that Defendants were "taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial." *Davis*, 912 F.2d at 134. Defendants provide the relevant facts and argument:

> It was only after discovery ended that Carnell disclosed its intention to seek damages regarding its bonding capacity, and it never once before trial disclosed that it was specifically seeking damages as a result of its claimed inability to perform VDOT work. Instead of asserting, which Carnell cannot, that it disclosed that it was seeking damages as a result of its inability to perform VDOT work, Carnell claims that its disclosure (after the close of discovery) that it intended to present evidence on its "good name" and "reputation" somehow alleviated DRHA's and Blaine

Square's surprise at the VDOT-related testimony.

Defs.' Rep. Br. JAML/New Tr. at 8. Defendants state that "Carnell disclosed <u>for the first time</u> <u>ever</u>" that it was seeking damages related to bonding capacity "19 days after the close of discovery." *Id.* at 10. Due to these problems with discovery, Defendants filed a Motion in Limine to exclude "[a]ll witnesses and exhibits disclosed after the discovery deadline." Defs. Mot. Limine, ECF No. 102. I partially granted Defendants' motion, stating in my Order that, "a subsequent [after discovery cut-off] disclosure of specific damages such as lost jobs, extra expenses, etc., will be excluded because those kind of specific expenses and losses should have been disclosed." I did allow a general discussion of Carnell's lost bonding capacity during trial, but "prevented Carnell from putting numerical or dollar amounts of damages into evidence." Defs.' Rep. Br. JAML/New Tr. at 12. Defendants argue that "[t]he effect of the 1/31/11 Order as applied by the Court was to allow Carnell to present the exact evidence which it had not disclosed during discovery . . . . The limitation regarding a specific dollar amount simply allowed Carnell to put on this evidence with no parameters of value and allowed the jury to speculate as to the amount of such damages." *Id.* I agree. The Order on the Motion in Limine allowed Plaintiffs to surprise Defendants at trial with M. Scales' VDOT testimony. I attempted to "split the baby" with my Order on Defendants' Motion in Limine, reasoning that Defendants should have been on notice that such damages would be at issue in the case, but that Plaintiff should not be able to introduce specific evidence in violation of the discovery deadline. For the reasons just discussed, I now believe that Order was a grievous error. This error and its subsequent effects at trial satisfy the third prong of *Davis*. As Plaintiff has met its burden under *Davis*, I am compelled to conclude that a new trial is warranted under Rule 59.

### 2. Defendants' Alternative Grounds for a New Trial

Because I find a new trial is warranted based on the above discussion, I need not address

Defendants' other arguments in support of its Rule 59 motion.

V. Conclusion

For the foregoing reasons, Defendants' Rule 50(b) Motion for Judgment as a Matter of Law is **DENIED**, and Defendants' Rule 59(a)(1)(A) Motion for a New Trial is **GRANTED**. All other pending motions are **OVERRULED AS MOOT**.

The Clerk is directed to send a copy of the Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 2nd day of May, 2011.

s/Jackson L. Kiser            
Senior United States District Judge