IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| CARNELL CONSTRUCTION CORPORATION, | ) | |
| | ) | |
| Plaintiff / Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 4:10CV00007 |
| DANVILLE REDEVELOPMENT & HOUSING AUTHORITY, | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| Defendant / Counterclaim Plaintiff, | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| v. | ) | |
| | ) | |
| BLAINE SQUARE, LLC, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL FIDELITY INSURANCE COMPANY, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

This case was originally assigned to United States District Judge Jackson L. Kiser.

Following a jury verdict in favor of Carnell Construction Corporation ("Carnell") on its claim of

race discrimination under Title VI of the Civil Rights Act of 1964, Judge Kiser granted the

defendants' motion for new trial and transferred the matter to the undersigned district judge.

Thereafter, the court permitted Carnell to file a third amended complaint and the parties were

granted leave to seek additional discovery.  The case is presently before the court on motions for

summary judgment filed by Carnell, Danville Redevelopment & Housing Authority ("DRHA"),

and Blaine Square, LLC ("Blaine Square").  For the reasons set forth below, the parties' motions

will be granted in part and denied in part.

## Summary of the Facts[1]

This case stems from work performed on Phase 4 of the Blaine Square Hope VI Project in Danville, Virginia ("the Project").  The Project involved the fourth phase in plans to construct forty single family and duplex housing units.  The Project was funded through a combination of public and private funds, including Hope VI funds from the United States Department of Housing and Urban Development ("HUD").  Hope VI is a grant program developed for the purpose of eradicating severely distressed public housing.

DRHA is a public housing agency created pursuant to Virginia Code § 36-4.  During the time period at issue, Gary Wasson was the Executive Director and Chief Executive Officer of DRHA, and Cedric Ulbing was DRHA's Hope VI Director.  Cornerstone Danville, LLC ("Cornerstone") was the master developer for DRHA's entire Hope VI grant, including the prior three phases of the grant.  Defendant Blaine Square was formed to develop, own, and operate the Project, for which it received tax credits.[2]

In March of 2008, DRHA solicited bids for the site preparation work required to develop the fourth phase of the Project.  Carnell, a minority-owned site preparation and construction firm,[3] submitted the lowest bid.  DRHA accepted Carnell's bid, and on May 27, 2008, DRHA

---

[1] The court's brief summary of the facts is taken, in large part, from Judge Kiser's earlier opinion on motions for summary judgment filed by DRHA and Blaine Square.  See Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth., No. 4:10CV00007, 2011 U.S. Dist. LEXIS 8259, at *2-8 (W.D. Va. Jan. 27, 2011).

[2] Additional facts regarding Blaine Square are set forth below in the section discussing Blaine Square's motion for summary judgment.

[3] It is undisputed that Carnell is a minority-owned business.  Its president and sole shareholder is African-American, and the company has received certification as a "Small, Women- and Minority-owned Business" by the Virginia Department of Minority Business Enterprise.

and Carnell entered into a contract (hereinafter "the Contract") for the site preparation work. The Contract incorporated two sets of general conditions: Standard General Conditions of the Construction Project prepared by the Engineers Joint Contract Documents Committee for the National Society of Professional Engineers, the American Council of Engineering Companies, and the American Society of Civil Engineers ("EJCDC General Conditions"); and the General Conditions for Construction Contracts – Public Housing Programs prepared by HUD ("HUD General Conditions").

Shortly after executing the Contract, DRHA assigned its interest in the Contract to Blaine Square for tax purposes.  Three days later, however, DRHA and Blaine Square entered into a Development Services Agreement pursuant to which DRHA continued to supervise the construction of the Project, including the site preparation work provided pursuant to the Contract.  Counterclaim defendant International Fidelity Insurance Company ("IFIC") issued Carnell the performance bond required under the Contract, and thereby acted as Carnell's surety on the Project.

DRHA issued Carnell a notice to proceed on May 27, 2008.  Carnell began work on the Project on June 9, 2008, but was immediately forced to stop because another contractor had not finished clearing the site.  Due to the delay, Carnell did not begin working in earnest until the middle of June.  The initial holdup led to further problems and the parties soon became dissatisfied with each other's performance under the Contract.

Carnell's costs ultimately exceeded expectations and the parties disagree as to who should bear responsibility.  DRHA argues that Carnell failed to perform according to the plans and specifications and pursuant to the work schedule.  Carnell argues that DRHA changed the

3

plans without informing Carnell and that Carnell's work was accurate based on the plans the contractor was originally given. The parties met in December of 2008 to attempt to resolve their differences. They agreed to enter into mediation, and that Carnell would continue working on the Project. The parties entered into mediation on April 6, 2009, but were ultimately unable to resolve their issues. As Judge Kiser previously emphasized, the parties now dispute which of Carnell's claims were actually mediated.

By letter dated May 14, 2009, DRHA, through counsel, advised Carnell that "DRHA ha[d] no plans to extend Carnell's contract past the completion date," and that Carnell would need to remove all equipment and personnel from the site on the completion date regardless of whether Carnell had completed the site work.[4]  (Carnell Mot. for Summ. J. Ex. 13).  Carnell left the Project on or about May 14, 2009, with some work left incomplete.  On July 7, 2009, Carnell mailed 25 invoices for extra or additional work that Carnell allegedly performed.  Carnell's invoices were rejected in writing on July 23, 2009.  By letter dated December 14, 2009, seven months after Carnell left the project, counsel for DRHA informed IFIC that DRHA was considering declaring a contractor default, and requested a conference with Carnell and IFIC within fifteen days to discuss methods of performing the Contract.  A telephone conference was held on January 29, 2010, and on February 15, 2010, DRHA declared a contractor default against Carnell under the bond.

Additionally, at various times throughout the project, Carnell complained that it was being singled out and discriminated against due to its status as a minority contractor.  Carnell

---

[4] The Contract's original completion date was June 3, 2009; however, one day was added to the Contract by change order, thereby extending the completion date to June 4, 2009.

notes that immediately after learning that Michael Scales, the President of Carnell, is African-American and that Carnell had submitted the lowest bid, Cedric Ulbing asked Scales if Carnell wanted to withdraw its bid.  After Scales declined to withdraw the bid, Ulbing stated in an email to Gary Wasson that it had been his experience that minority contractors pay their employees less, and that African-American employees traditionally accept lower wages.  Carnell emphasizes that DRHA prepaid another contractor for materials before it started work without providing Carnell the same opportunity, and that DRHA withheld ten percent retainage from Carnell and only five percent from other contractors.  Carnell also highlights the fact that DRHA denied Carnell's change order requests and terminated its contract, while extending the contracts of non-minority contractors.

Michael Scales testified that he expressly complained of race discrimination during a meeting with Gary Wasson on December 10, 2008.  "Soon after the meeting between Wasson and M. Scales, DRHA threatened to fire Carnell."  Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth., No. 4:10CV00007, 2011 U.S. Dist. LEXIS 47125, at *17 (W.D. Va. May 3, 2011) (citing 2/7/11 Trial Tr. at 206-07, 211-13; 2/8/11 Trial Tr. at 202; 2/10/11 Trial Tr. at 102, 144-45).  On April 16, 2009, Scales voiced his race discrimination concerns directly to DRHA's Board of Commissioners.  The following month, Carnell was terminated from the Project.

## **Procedural History**

Carnell commenced the instant action on February 17, 2010, asserting a claim of race discrimination under 42 U.S.C. § 1983 against DRHA, and a supplemental claim for breach of contract.  The following day, Carnell filed an amended complaint, in which it substituted a claim

of race discrimination under Title VI against DRHA, in place of its previously asserted claim under § 1983.

On September 16, 2010, Carnell sought leave to amend its complaint a second time.  The motion was granted, and Carnell filed its second amended complaint on October 18, 2010.  The second amended complaint added Blaine Square as a defendant to the breach of contract claim, and also asserted a claim for quantum meruit.

The defendants answered each complaint and filed counterclaims against Carnell for breach of contract.  Additionally, the defendants filed a counterclaim against IFIC.

DRHA and Blaine Square subsequently moved for summary judgment against Carnell, and DRHA and IFIC filed cross-motions for summary judgment.  On January 27, 2011, the motion for summary judgment filed by DRHA and Blaine Square against Carnell was granted in part and denied in part.  Judge Kiser held that the Virginia Public Procurement Act limits the amount of recovery on Carnell's contract claim to a statutory maximum of $142,557.57, plus the withheld retainage.  Judge Kiser also held that the Contract precludes a claim for quantum meruit.  The motion for summary judgment was otherwise denied with respect to the defendants' remaining arguments.  In a separate opinion, Judge Kiser also denied IFIC's motion for summary judgment and granted DRHA's cross-motion for partial summary judgment, holding that IFIC would be liable to DRHA under the bond, if the jury was to find that certain contractual conditions were met by DRHA.

The jury trial commenced on February 7, 2011.  On February 14, 2011, Carnell moved to amend its complaint to conform to the evidence.  Specifically, Carnell sought to add a Title VI claim for retaliation against DRHA, based, in part, on trial testimony from Sylvester Mayo, a

6

member of DRHA's Board of Commissioners.[5]  Judge Kiser denied the motion in open court, emphasizing that "the common phrase of a moving target fits this case to a T."  (2/15/11 Trial Tr. at 137).

On February 17, 2011, the jury returned a verdict against DRHA in the amount of $3,168,341.14 on Carnell's discrimination claim under Title VI.  The jury also found that Carnell, DRHA, and Blaine Square breached the Contract.  However, the jury did not award any damages for the breach of contract claims.  The jury also found in favor of IFIC on DRHA's counterclaim against the bond.

DRHA and Blaine Square subsequently filed a motion for judgment as a matter of law or, in the alternative, motion for new trial.  Judge Kiser denied the motion for judgment as a matter of law, finding that there was sufficient evidence to support Carnell's claim of race discrimination.  However, he granted the motion for new trial on the basis that Carnell's primary witnesses provided false testimony at trial.  Specifically, Judge Kiser found that Michael Scales and Vincent Scales, Carnell's project manager, both testified falsely regarding Carnell's ability to perform work for the Virginia Department of Transportation subsequent to its dispute with DRHA.  Having concluded that a new trial was warranted on the basis of the false testimony, Judge Kiser declined to consider the other grounds raised in support of the defendants' motion.

After the case was transferred to the undersigned district judge, Carnell and IFIC moved for entry of judgment on certain claims, and Carnell moved for leave to file a third amended

---

[5] During his direct examination, Mayo testified that after Carnell played the "race card" in April of 2009, he "really wanted [Carnell] to go ahead and leave" the Project.  (2/11/11 Trial Tr. at 10).  Later, on cross-examination, Mayo testified that he recommended that Carnell be removed from the property, and that Carnell's complaint of race discrimination was a factor in his decision.  (Id. at 21).

complaint.  By opinion and order entered June 27, 2011, the court denied the motions for entry of judgment and granted the motion for leave to file a third amended complaint.

The third amended complaint, filed on July 5, 2011, adds Blaine Square as a defendant to the Title VI claim for race discrimination.  It also includes a claim for race discrimination against DRHA and Blaine Square under 42 U.S.C. § 1981, as well as a claim for retaliation under Title VI and § 1981.

The case is presently before the court on motions for summary judgment filed by Carnell, DRHA, and Blaine Square.  The court held a hearing on the motions on January 3, 2012.  The motions are ripe for review.

## **Standards of Review**

Because Judge Kiser previously ruled on a number of issues raised in the motions for summary judgment, the resolution of the instant motions requires consideration of Rule 56 of the Federal Rules of Civil Procedure and the "law of the case" doctrine.

Under Rule 56, an award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party.  Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

The law of the case doctrine "is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." United States v. U.S. Smelting Refining & Mining Co., 339 U.S. 186, 198 (1950). Application of the doctrine varies depending on whether a prior ruling was rendered by an appellate court or another district judge. As the United States Court of Appeals for the Fourth Circuit has noted,

> whether rulings by one district judge become binding as "the law of the case" upon subsequent district judges is not a matter of rigid legal rule, but more a matter of proper judicial administration which can vary with the circumstances. It may sometimes be proper for a district judge to treat earlier rulings as binding, sometimes not.

Hill v. BASF Wyandotte Corp., 696 F.2d 287, 290 n.3 (4th Cir. 1982). Accordingly, the doctrine is a "rule of discretion." Smith v. Bounds, 813 F.2d 1299, 1304 (4th Cir. 1987). The court may exercise its discretion to depart from another judge's ruling if "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would result." Mendenhall v. Nat'l Transp. Safety Bd., 213 F.3d 464, 469 (9th Cir. 2000).

## Discussion

### I.   DRHA's Motion for Summary Judgment

DRHA has moved for summary judgment on Carnell's breach of contract claim and Carnell's claims under § 1981 and Title VI. The court will address each set of claims in turn.

#### A.   Breach of Contract Claim

Carnell asserts that DRHA breached the Contract by refusing to pay for extra work that Carnell was allegedly required to complete, and by wrongfully withholding the ten percent

retainage.  In moving for summary judgment on Carnell's breach of contract claim, DRHA argues that Carnell failed to comply with requisite contractual and statutory provisions.

### 1.   Contractual Change Order Provisions

DRHA first argues that it is entitled to summary judgment on Carnell's breach of contract claim because Carnell failed to comply with the Contract's change order, claims, and dispute resolution provisions, which DRHA argues are conditions precedent to Carnell's right to recovery.  The Contract's EJCDC General Conditions and HUD General Conditions both contain procedures that a contractor must follow to obtain relief from changes to the contract.  For instance, under the HUD General Conditions, when a contractor believes that it has been instructed or required to do work which is not within the original scope of the contract, it must, within thirty days, (1) give written notice to the owner that it regards the order to do such work as a change order, and (2) provide the owner with a written statement of the nature of the work and the amount of the requested price adjustment.  (HUD General Conditions § 29).  Similarly, under the EJCDC General Conditions, a contractor seeking an adjustment to the contract price is required to provide written notice of the nature of the claim to the engineer and owner within thirty days of the event giving rise to the claim.  (EJCDC General Conditions § 10.05).  Within sixty days of the event giving rise to the claim, the Contractor must provide notice of the amount and extent of the claim with supporting data and a statement that the amount listed is the full amount sought for the claim.  Id.  The engineer then reviews the request and approves it, denies it, or states that it is inappropriate for him to decide the issue.  Id.

The Virginia Supreme Court has held that, in the absence of waiver, written notice requirements in a contract are binding and enforceable.  See, e.g., Atl. & Danville Ry. Co. v.

Del. Constr. Co., 37 S.E. 13, 16 (Va. 1900) (emphasizing that "[n]o claim for extra work, if any there were, was therefore allowable, unless the said provision was duly waived").  When DRHA raised the same argument in its first motion for summary judgment, Judge Kiser rejected it, holding that a reasonable jury could find that DRHA waived its right to enforce the contractual change order and dispute resolution procedures and instead agreed to incorporate all of Carnell's claims into the parties' mediation efforts.  Citing an affidavit from Vincent Scales and deposition testimony from Cedric Ulbing and Gary Wasson, Judge Kiser emphasized that the scope of the parties' mediation is a disputed issue of fact, and that "[i]f Wasson, Ulbing and Defendants agreed to incorporate all present and future claims for extra work into the mediation, then a reasonable jury could find that DRHA waived its right to enforce the change order provisions in the contract."  Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth., No. 4:10CV00007, 2011 U.S. Dist. LEXIS 8259, at *17 (W.D. Va. Jan. 27, 2011).  In addition, after noting that DRHA would not sign any more change orders after the dispute began, and that this sentiment was conveyed to Carnell, Judge Kiser emphasized that "DRHA cannot claim the protection of a contractual provision which it instructed Carnell not to follow."  Id.  Judge Kiser observed that a definite agreement to mediate all claims would "constitute[] the 'clear, unequivocal and convincing evidence' necessary to show 'mutual intention' that the parties waived or modified the Contract's dispute resolution procedures."  Id. at *18 (quoting Cardinal Dev. Co. v. Stanley Constr. Co., 497 S.E.2d 847, 851 (Va. 1998)).

In the instant motion, DRHA argues that the doctrine of waiver cannot be applied against DRHA because it was acting in its governmental capacity in contracting for and overseeing the site work for the Blaine Square Project and, thus, that Judge Kiser's ruling was clearly erroneous. To support this argument, DRHA cites the United States District Court for the Eastern

District of Virginia's decision in <u>Charlie Norfolk Center Associates, LP v. Norfolk Redevelopment and Housing Authority</u>, No. 2:06CV00616, 2007 U.S. Dist. LEXIS 21369 (E.D. Va. Mar. 26, 2007), and the Virginia Supreme Court's decision in <u>Main v. Department of Highways</u>, 142 S.E.2d 524 (Va. 1965).  For the following reasons, the court agrees with Carnell that the facts in the foregoing cases are distinguishable from those in the instant case, and that Judge Kiser did not clearly err in denying DRHA's motion for summary judgment with respect to this issue.

In <u>Charlie Norfolk Center Associates</u>, the district court recognized the general principle under Virginia law that "the doctrines of waiver and estoppel may not be asserted against a governmental entity when it acts in its governmental capacity," and ultimately concluded that the defendant, a local housing authority, could not "be said to have waived any conditions precedent to the option agreement in th[e] case." <u>Charlie Norfolk Ctr. Assocs.</u>, 2007 U.S. Dist. LEXIS 21369, at *20 (internal citations omitted).  In reaching its decision, however, the district court emphasized that the housing authority's ability to act in the particular case was restricted by Virginia Code § 36-53, and that any acts outside of that statutory authority would be "<u>ultra</u> <u>vires</u> and void <u>ab</u> <u>initio</u>." <u>Id.</u>  Consequently, the district court held that the "prevention doctrine . . . [could not] apply against the defendant in contravention of its statutory mandate to dispose of private developers in accordance with governing law, as its application would make the transfer of such property void for want of authority." <u>Id.</u>

Similarly, in <u>Main</u>, the Virginia Supreme Court observed that the "legislature alone has the authority to dispose of or dispense with" the rights of a State when acting in its governmental capacity and, thus, that the doctrine of estoppel does not apply to such rights.  <u>Main</u>, 142 S.E.2d at 150.  Because a particular section of the Virginia Code "clearly set forth the manner in which

12

contracts for the construction of state highways may be entered into," the Court held that when the specifications for such work have been promulgated, "they cannot be changed or waived by subordinate employees of the Department of Highways."  Id.; see also Wolfe v. Bd. of Zoning Appeals, 532 S.E.2d 621, 627 (Va. 2000) (rejecting the plaintiff's estoppel argument and emphasizing that "no subordinate municipal official can bind the municipality to an incorrect . . . interpretation of the [municipality's] ordinances").

In the instant case, Carnell is not seeking to estop DRHA from enforcing a statute, regulation, or ordinance, or otherwise suggesting that DRHA took actions that fell outside the bounds of its statutory or regulatory authority.  Instead, Carnell argues, as Judge Kiser held, that a reasonable jury could find that DRHA agreed to modify and/or waive the change order and dispute resolution procedures in the parties' Contract, and to instead incorporate all of Carnell's claims into the mediation process.  DRHA's willingness to mediate, as its counsel acknowledged during oral argument, was a "business decision" that was intended to "make life easier."  To the extent DRHA agreed to modify and/or waive contractual provisions as part of its effort to resolve Carnell's claims, the court is convinced that the foregoing cases do not preclude DRHA from being bound by its "business decision."  Accordingly, Judge Kiser's ruling was not clearly erroneous, and the court likewise concludes that a reasonable jury could find that DRHA agreed to modify and/or waive the contractual change order and dispute resolution procedures.

### 2.      The Virginia Public Procurement Act

DRHA also argues that Carnell's claim for damages relating to extra work that Carnell was allegedly required to perform is barred by the Virginia Public Procurement Act ("VPPA"), which requires that "written notice of the contractor's intention to file a claim . . . be given at the time of the occurrence or beginning of the work upon which the claim is based."  Va. Code §

13

2.2-4363.  DRHA emphasizes that the provisions of the VPPA are "mandatory, procedural requirements which must be met in order for a court to reach the merits of a case."  Dr. William E.S. Flory Small Bus. Dev. Ctr. v. Commonwealth, 541 S.E.2d 915, 919 (Va. 2001).

DRHA raised the same argument in its first summary judgment motion.  Judge Kiser held that whether Carnell provided adequate notice of its intention to file a claim was an issue of disputed fact, since Vincent Scales averred in an affidavit that, following the conclusion of the parties' mediation efforts, Carnell delivered notice of intention to file suit.  Judge Kiser emphasized that, accepting the declaration as true, "this would constitute adequate notice under the 'at the time of the occurrence' language of § 2.2-4363(A), because until the mediation was concluded successfully, Carnell could not have known whether it needed to file suit."  Carnell Construction Corp., 2011 U.S. Dist. LEXIS 8259, at *27.  For the reasons expressed by Judge Kiser, the court agrees that disputed issues of material fact preclude the grant of summary judgment on this issue, and that the jury must decide whether Carnell provided adequate and timely notice of its intention to file a claim, as required by the VPPA.

For all of the foregoing reasons, DRHA's motion for summary judgment will be denied with respect Carnell's breach of contract claim.

### B.     Claims under § 1981

As summarized above, Carnell's third amended complaint asserts claims of race discrimination and retaliation under 42 U.S.C. § 1981 against DRHA and Blaine Square.  For the following reasons, the court concludes that DRHA is not amenable to suit under § 1981 and, thus, that its motion for summary judgment must be granted with respect to these claims.

Section 1981 provides, in pertinent part, as follows:

14

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

In Jett v. Dallas Independent School District, 491 U.S. 701 (1989), the United States Supreme Court ruled that § 1981, while providing extensive rights, does not provide a remedy against state actors. Id. at 731. The Court rejected the plaintiff's claim against his public school employer, holding that the exclusive federal remedy for violations of the rights guaranteed by § 1981 is 42 U.S.C. § 1983. Id. Stated differently, the Court held that "while § 1981 creates rights, § 1983 provides the remedy to enforce those rights against state actors." McGovern v. City of Phila., 554 F.3d 114, 116 (3d Cir. 2009).

While the United States Court of Appeals for the Ninth Circuit has held that amendments to the Civil Rights Act overruled Jett, the majority of circuits, including the Fourth Circuit, has rejected this assertion. Compare Dennis v. Cnty. of Fairfax, 55 F.3d 151, 156 n.1 (4th Cir. 1995) ("We do not believe that this aspect of Jett was affected by the Civil Rights Act of 1991 . . . ."), McGovern, 554 F.3d at 120-21 ("[We] hold that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.") (internal citation omitted), Arendale v. City of Memphis, 519 F.3d 587, 598-99 (6th Cir. 2008) ("[N]o independent cause of action against municipalities is created by § 1981(c)."), Bolden v. City of Topeka, 441 F.3d 1129, 1137 (10th Cir. 2006) ("We therefore conclude that even after the 1991 amendments to § 1981, damages claims against state actors for § 1981 violations must be brought under § 1983."), and Oden v. Oktibbeha Cnty., 246

15

F.3d 458, 463-64 (5th Cir. 2001) ("[W]e are not willing to deviate from the Supreme Court's analysis of § 1981 in Jett."), with Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996) ("[W]e conclude that the amended 42 U.S.C. § 1981 contains an implied cause of action against state actors, thereby overturning Jett's holding . . . .").

In this case, it is clear from the record and applicable case law that DRHA is a state actor for purposes of § 1981. See Jett, 491 U.S. at 731-736. Accordingly, because Carnell "has no cause of action based on § 1981 independent of § 1983," DRHA's motion for summary judgment will be granted with respect to Carnell's § 1981 claims. Farmer v. Ramsay, 43 F. App'x 547, 553 n.8 (4th Cir. 2002).

### C.     Claims under Title VI

Carnell also asserts claims of race discrimination and retaliation under Title VI of the Civil Rights Act of 1964. In moving for summary judgment with respect to these claims, DRHA asserts a host of arguments, many of which were already rejected by Judge Kiser.

### 1.     Standing as a Corporation

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In moving for summary judgment on Carnell's Title VI claims, DRHA first argues that Carnell lacks standing to pursue a claim under this statute because it is a corporation. Quoting dictum in Village of Arlington Heights v. Metropolitan Housing Development Corp.,

16

429 U.S. 252 (1977), DRHA maintains that a corporation "has no racial identity and cannot be the direct target of the . . . alleged discrimination."[6] Id. at 263.

DRHA raised this argument in its first motion for summary judgment.  Upon reviewing cases addressing the same issue in the context of Title VI and other statutes prohibiting race discrimination, Judge Kiser ultimately held that Carnell has standing to bring its Title VI claim, notwithstanding its corporate identity.  See Carnell Constr. Corp., 2011 U.S. Dist. LEXIS 8259, at *32.

As Judge Kiser explained in his opinion, the United States Court of Appeals for the Second Circuit considered this precise issue in the context of §§ 1981, 1983, 1985, and 2000d in Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702 (2d Cir. 1982).  The Second Circuit found the above quoted language from Arlington Heights to be of only "academic importance," and noted that the Court did "not believe that the Supreme Court would slavishly apply it so as to deny [the Theater] its day in court."  Id. at 704.  In holding that the corporate plaintiff had standing to pursue its race discrimination claims, the Second Circuit emphasized that it would be "hard to believe that the Supreme Court would deny standing to the corporation because it has 'no racial identity and cannot be the direct target' of discrimination while at the same time it would be obliged to deny standing to the stockholders on the sound ground that the injury was suffered by the corporation and not them."  Id. at 705-06.

---

[6] In Arlington Heights, the Supreme Court held that the corporation had standing because it had suffered injury and had a "right to be free of arbitrary or irrational zoning actions."  429 U.S. at 263. After making the observation concerning the racial identity of corporations, the Court stated that it "need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit [the corporation] to assert the constitutional rights of its prospective minority tenants," since "at least one individual plaintiff . . . has demonstrated standing to assert these rights on his own."  Id. Consequently, courts have emphasized that the statement cited by DRHA is "clearly dictum."  Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1058 n.1 (9th Cir. 2004).

This court's review of applicable case law reveals that a majority of courts have reached the same conclusion as the Second Circuit.  Prior to Heimbach, in Des Vergnes v. Seekonk Water District, 601 F.2d 9 (1st Cir. 1979), the First Circuit acknowledged the language in Arlington Heights, but nonetheless granted a corporate plaintiff third-party standing to litigate its race discrimination claim.  The First Circuit held that the corporation had "an implied right of action against any other person who, with a racially discriminatory intent, interferes with its right to make contracts with non-whites." Id. at 13-14.  Likewise, after Heimbach, a number of courts have held that a minority- owned business has standing to pursue a claim for discrimination.  For instance, in Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1059 (9th Cir. 2004), the Ninth Circuit held that "[w]hen a corporation has acquired a racial identity, either as a matter of law or by imputation, then it can be the direct target of discrimination and has standing to pursue a claim under § 1981."  See also Emory Utilities, Inc. v. Time Warner Cable, Inc., No. 7:09CV000169, 2010 U.S. Dist. LEXIS 58834, at *6 (E.D.N.C. June 11, 2010) (adopting the reasoning of Heimbach and holding that "a minority owned business does have standing to pursue a claim under 42 U.S.C. § 1981"); Bank Realty Inc. v. Practical Mgmt. Tech., Inc., No. 88-3681, 1990 U.S. Dist. LEXIS 7480, at *9 (D. Md. June 15, 1990) ("There have been few corporate claims for violation of §§ 1981, 1982, and 1985. However, those courts which have considered the question have held that a corporation, when owned or managed by a minority, may have standing to bring a suit under § 1981.").

Having reviewed the foregoing case law, the court concurs with Judge Kiser's decision and concludes that it was not clearly erroneous.  While the court recognizes that the Third Circuit recently held, in summary fashion, that a Charter School "does not qualify as a 'person'

with standing to sue for relief under Title VI," <u>Pocono Mt. Charter Sch. v. Pocono Mt. Sch. Dist.</u>, No. 10-4478, 2011 U.S. App. LEXIS 17974, at *16 (3d Cir. Aug. 25, 2011), the court is convinced that Carnell, as a certified minority-owned business, does have standing to bring its Title VI claim.  <u>See</u>, <u>e.g.</u>, <u>Thinket</u>, 368 F.3d at 1059 (emphasizing, in holding that the plaintiff qualified as a person with standing to pursue a claim under § 1981, that the plaintiff "was required to be certified as a corporation with a racial identity to receive certain government benefits"); <u>Florence Urgent Care v. HealthSpan, Inc.</u>, 445 F. Supp. 871, 877 (S.D. Ohio 2006) (holding that a corporation owned entirely by doctors of Arab descent had standing to pursue a claim under § 1981, and emphasizing that "where a corporation is owned and controlled by members of one racial group, it only comports with justice and common sense to conclude that such corporation could be the target of racial animus").  Accordingly, to the extent DRHA has moved for summary judgment on this basis, the motion is denied.

### 2.  <u>Standing as an Intended Beneficiary</u>

DRHA alternatively argues that Carnell cannot pursue its claim under Title VI, because Carnell was not an "intended beneficiary" of DRHA's federally funded program.  DRHA contends that the only intended beneficiaries of the HOPE VI funds used for the project are the individuals for whom the housing units were developed.  In response, Carnell argues that proper Title VI plaintiffs include not only "intended beneficiaries," but also litigants that fall within the "zone of interests" or have a "logical nexus" to the federally funded program.

When DRHA raised this argument in its first motion for summary judgment, Judge Kiser sided with Carnell and held that Carnell's logical nexus to DRHA's HOPE VI funds was sufficient to provide standing to pursue a claim under Title VI.  Judge Kiser emphasized that

Carnell and DRHA entered into a contract funded through federal dollars and subject to the federal HUD General Conditions, and that Carnell's work was a vital component of the Blaine Square Project.  In holding that Carnell's logical nexus to the Project was sufficient to provide standing, Judge Kiser found persuasive the United States District Court for the Middle District of North Carolina's decision in Bogdan v. Housing Authority of the City of Winston-Salem, No. 1:05CV00568, 2006 U.S. Dist. LEXIS 94129 (M.D.N.C. Dec. 29, 2006).

In Bogdan, the defendant, like DRHA, argued that the plaintiff had to be an intended beneficiary of the defendant's federal funds in order to pursue a claim under Title VI.  Citing cases from other districts, the Court disagreed and held that it would "allow Plaintiff's claim so long as he has a logical nexus to a federally funded program; meaning that he is either an intended beneficiary, an applicant, or a participant."  Id. at *20 (emphasis in original).  The Court emphasized that such standard "comports with the plain language of the statute, which prohibits any person from being 'subjected to discrimination' by any entity receiving federal financial assistance."  Id. (quoting 42 U.S.C. § 2000d); see also Bryant v. N.J. Dep't of Transp., 998 F. Supp. 438, 445 (D.N.J. 1998) ("The interests arguably to be protected by Title VI, then, are those of persons against whom federally funded programs discriminate.").  The Court also reasoned that such standard "furthers the twin aims of Title VI, to prevent discrimination by entities receiving federal funds and to provide citizens with effective protection against discrimination."  Id. at *13 (citing Cannon v. Univ. of Chicago, 441 U.S. 667, 703 (1979)).

The Bogdan Court concluded that the plaintiff created a logical nexus between the alleged discrimination and his maintenance contract with the defendant housing authority that was sufficient to survive a motion to dismiss.  Id. at *21.  The facts before the Court were that

the housing authority received federal funding for its housing program, and that the plaintiff was under a contract to repair and maintain the housing facilities.  Id.  In such situation, the Court held that although the plaintiff was not an intended beneficiary of the affordable housing project, he still "participated" in the program by receiving profitable contracts.  Id. at *22.  The Court emphasized that "[a]llowing Defendants to subject Plaintiff to discrimination without fear of losing federal funding [would] offend[] both the purpose and plain language of Title VI."  Id.

Like Judge Kiser, the court is persuaded by the reasoning of Bogdan and the decisions cited therein.  Accordingly, because Carnell has a logical nexus to the federally funded program at issue, the court concludes that Carnell is entitled to pursue its claim under Title VI, and that DRHA's motion for summary judgment must be denied with respect to this argument.

### 3.    <u>Contractual Conditions</u>

DHRA also argues that the Contract's notice and dispute resolution procedures are conditions precedent to Carnell's recovery under Title VI, and that Carnell's failure to adhere to the procedures bars its Title VI claims.  This argument was rejected when it was raised in DRHA's first motion for summary judgment, and the court is convinced that Judge Kiser's decision was not clearly erroneous.  If Carnell's Title VI claims were covered by the Contract's dispute resolution procedures, as Judge Kiser explained, it would put DRHA in the position of both defending and adjudicating Carnell's allegations of discrimination and retaliation.  The court agrees with Judge Kiser that this result "is inconsistent with the twin goals of Title VI," and compels the conclusion that the dispute resolution procedures were never intended to control discrimination or retaliation claims.  Carnell Constr. Corp., 2011 U.S. Dist. LEXIS 8259, at *38-39.

**4.      The Merits of Carnell's Discrimination Claim**

DHRA next argues that it is entitled to summary judgment on the merits of Carnell's

claim of race discrimination under Title VI.  As Carnell emphasizes in its brief in opposition,

Judge Kiser held on three separate occasions that the evidence, taken in the light most favorable

to Carnell, supports a finding of intentional race discrimination.

Most recently, in denying DRHA's Rule 50(b) motion for judgment as a matter of law,

Judge Kiser explained that claims under Title VI are appropriately analyzed using the Title VII

proof scheme.  Carnell Constr. Corp., 2011 U.S. Dist. LEXIS 47125, at *10 (citing

Middlebrooks v. Univ. of Md., No. 97-2473, 1999 U.S. App. LEXIS 305 (4th Cir. Jan. 11.

1999)).  Quoting from the Fourth Circuit's decision in Diamond v. Colonial Life & Accident

Insurance Co., 416 F.3d 310, 318 (4th Cir. 2005), Judge Kiser observed that a Title VII plaintiff

may "avert summary judgment . . . through two avenues of proof."  Carnell Constr. Corp., 2011

U.S. Dist. LEXIS 47125, at *10 (emphasis in original).  A plaintiff can either present "'direct or

circumstantial evidence that raises a genuine issue of material fact as to whether an

impermissible factor such as race motivated the employer's adverse employment decision,'" or

the plaintiff may proceed under the McDonnell Douglas[7] pretext framework "'under which the

employee, after establishing a prima facie case of discrimination, demonstrates that the

employer's proffered permissible reason for taking an adverse action is actually a pretext for

discrimination.'"  Id. (quoting Diamond, 416 F.3d at 318).  Judge Kiser ultimately held that,

regardless of which method of proof is used, Carnell "provide[d] a sufficient evidentiary basis

---

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

such that a reasonable jury could conclude that [DRHA] intentionally discriminated against

[Carnell] in violation of Title VI and, as a result, [Carnell] suffered adverse consequences."  Id.

at *11; see also Diamond v. Bea Maurer, Inc., 128 F. App'x 968, 971 (4th Cir. 2005) ("No

matter which method of proof is used, the ultimate question 'is a straightforward one – whether

plaintiff[] successfully demonstrated that [she was] the victim[] of . . . discrimination . . . ."

(quoting Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994))).

Judge Kiser's opinion on DRHA's Rule 50(b) motion is replete with examples that

supported a finding of race discrimination, including instances of disparate treatment, evidence

suggestive of pretext, evidence that DRHA officials covered up Carnell's initial complaint of

race discrimination, and DRHA's "shifting explanations for Carnell's termination from the

Project."  Carnell Constr. Corp., 2011 U.S. Dist. LEXIS 47125, at *19.  For the reasons

expressed by Judge Kiser, the court is convinced that Carnell's claim of discrimination must be

decided by a jury, and that DRHA is not entitled to summary judgment on the merits of this

claim.

### 5.    The Merits of Carnell's Retaliation Claim

Based, in part, on testimony provided during the first trial, Carnell filed a third amended

complaint asserting a claim for retaliation under Title VI.  The testimony at issue was elicited

from Sylvester Mayo, a member of DRHA's Board of Commissioners.  As noted above, when

questioned regarding Carnell's April 2009 complaint of race discrimination, Mayo testified that

after Carnell played "the race card," Mayo "really wanted them to go ahead and leave" the

Project.  (2/11/11 Trial Tr. at 10).  Later, on cross-examination, Mayo testified that he

recommended that Carnell be removed from the Project, and that the complaint of race

23

discrimination was a factor in his decision.  (<u>Id.</u> at 21).  Approximately one month after Carnell complained of race discrimination to the Board, Carnell was removed from the Project.

Carnell's complaint of race discrimination in April of 2009 was not its first.  Michael Scales testified that he had a meeting with Gary Wasson on December 10, 2008, at Scales' request, during which Scales expressly complained of disparate treatment.  Soon after the meeting, DRHA threatened to fire Carnell.  These two incidents provide the grounds for Carnell's retaliation claim.

**a.**      **<u>Actions by the Board</u>**

Prior to considering the merits of Carnell's retaliation claim, the court must, as a threshold matter, consider whether Carnell is barred from basing such claim on the actions of DRHA's Board of Commissioners.  During Carnell's opening statement at the first trial, Carnell's counsel emphasized on more than one occasion that Carnell's claim of race discrimination was based on the actions of Gary Wasson and Cedric Ulbing, rather than those of the Board of Commissioners.  <u>See</u>, <u>e.g.</u>, 2/7/11 Trial Tr. at 9 ("Our claim in this case is not that these commissioners in any way were involved with the decisions [Wasson & Ulbing] were making."); <u>id.</u> at 21-22 ("Now again, it is not our contention in this case that the commissioners were doing – or knew what the executives were doing . . . . We are not contending in the case that these commissioners . . . are the ones who did what we are complaining about.").  Similarly, during Carnell's closing argument, counsel emphasized that Carnell's claims "have been since the beginning and remain against what these two executives did, and not the board."  (2/16/11 Tr. at 27-28).  DRHA now argues that the statements of counsel constitute "judicial admissions" on the part of Carnell, and that Carnell is barred from basing its newly asserted claim of

24

retaliation on the actions or inactions of the Board.  In light of the particular circumstances in this case, the court is unable to agree.

The Fourth Circuit's opinion in <u>New Amsterdam Casualty Co. v. Waller</u>, 323 F.2d 20 (4th Cir. 1963) provides a thorough overview of the doctrine of judicial admissions, which is generally limited to affirmative, factual admissions, rather than an attorney's legal theories, arguments, or conclusions:

> A judicial admission is usually treated as absolutely binding, but such admissions go to matters of fact which, otherwise, would require evidentiary proof.  They serve a highly useful purpose in dispensing with proof of formal matters and of facts about which there is no real dispute . . . .
>
> The doctrine of judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case.  When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission and sets up no estoppel which would prevent the court from applying to the facts disclosed by the proof, the proper legal principles as the Court understands them.

<u>Id.</u> at 24; <u>see</u> <u>also</u> <u>McCaskill v. SCI Mgmt. Corp.</u>, 298 F.3d 677, 681 (7th Cir. 2002) (citing cases distinguishing statements of legal opinion from stipulations of fact).

Courts have also recognized that, in order to qualify as a judicial admission, "an attorney's statements must be deliberate, clear, and unambiguous" and must constitute a deliberate voluntary waiver.  <u>MacDonald v. General Motors Corp.</u>, 110 F.3d 337, 340 (6th Cir. 1997); <u>see</u> <u>also</u> <u>McCaskill</u>, 298 F.3d at 682 (holding that counsel's response to the court's question was "not the sort of deliberate, clear, and unambiguous statement evincing an intentional waiver that has been held sufficient to constitute a judicial admission"); <u>Martinez v. Bally's La., Inc.</u>, 244 F.3d 474, 476 (5th Cir. 2001) ("A statement made by counsel during the

course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact.").

Moreover, even if a statement qualifies as a judicial admission, the statement is not necessarily binding. Instead, "[c]onsiderations of fairness and the policy of encouraging judicial admissions require that trial judges be given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." MacDonald, 110 F.3d at 340 (internal citation and quotation marks omitted); see also Martinez, 244 F.3d at 477 (recognizing that the court may allow a party to withdraw a judicial admission); New Amsterdam Cas. Co., 323 F.2d at 24 (emphasizing that "a court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission").

Applying these principles, the court concludes that the circumstances in the instant case do not justify barring Carnell from asserting a claim for retaliation based upon the actions of the Board or individual Board members. Counsel's remarks during his opening statement obviously came before Mr. Mayo's testimony, thereby precluding any suggestion of a deliberate, voluntary waiver on the part of Carnell. While counsel also reiterated, during closing argument, that Carnell's claims were based on the conduct of Wasson and Ulbing rather than the conduct of the Board, Carnell's first trial did not involve a claim of retaliation. Indeed, Carnell sought leave to add a claim of retaliation following Mr. Mayo's testimony, but Carnell was denied the opportunity to do so, leaving only its claims for breach of contract and race discrimination. Because claims of retaliation and discrimination are "distinct theories," Cuffee v. Verizon Commc'ns, Inc., 755 F. Supp. 2d 672, 680 (D. Md. 2010), the court is convinced that counsel's

26

comments regarding the evidence in support of Carnell's discrimination claim should not have preclusive effect on Carnell's claim of retaliation.

To the extent DRHA alternatively argues that it is not subject to liability under Title VI for any misconduct by individual Board members, since none of the adverse actions were "formally voted on or passed by the Board" (Br. in Supp. of Mot. for Summ. J. at 51), the court is similarly unpersuaded. As the Third Circuit previously emphasized in the context of Title IX of the Education Amendments of 1972, requiring a plaintiff to prove that a voting majority of a governing body was aware of, or sanctioned, the improper conduct "would undermine the private cause of action under [the statute] . . . and eliminate the protection Congress intended . . . ." Warren v. Reading Sch. Dist., 278 F.3d 163, 170 (3d Cir. 2002).

### b.      Sufficiency of the Evidence

DRHA also argues that Carnell cannot establish a prima facie case of retaliation, and that Carnell has failed to create a genuine issue of material fact as to whether DRHA's stated reasons for its adverse actions were pretextual. For the following reasons, the court does not agree.

In order to establish a prima facie case of retaliation, a plaintiff must present evidence that (1) it "engaged in protected activity"; (2) that the defendant "took a material adverse . . . action" against the plaintiff; and (3) "that a causal connection existed between the protected activity and the adverse action." Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). After the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000). The plaintiff must then demonstrate that the defendant's proffered reason was a pretext for retaliation. Id.

Having reviewed the record, the court concludes that the evidence, when viewed in the light most favorable to Carnell, is sufficient to establish a prima facie case of retaliation.  In order to satisfy the first element, that it engaged in protected activity, Carnell need only show that it "opposed an unlawful employment practice which [it] reasonably believed had occurred or was occurring."  Peters, 327 F.3d at 320.  In this case, as discussed above, Carnell contends that it expressly complained of race discrimination on two occasions.  Michael Scales, Carnell's President, testified that after encountering the disparate treatment outlined in Judge Kiser's previous opinions, he specifically complained of race discrimination during a meeting with Gary Wasson on December 10, 2008.  Thereafter, having "received no response from Wasson," Michael Scales brought his race discrimination concerns directly to DRHA's Board of Commissioners on April 16, 2009.  (Carnell Br. in Opp'n to DRHA's Mot. for Summ. J. at 20). While DRHA now maintains that it was unreasonable for Carnell to believe that it was being singled out because of race instead of its "poor performance," (DRHA Br. in Supp. of Summ. J. at 43), the court is convinced that a reasonable jury could find to the contrary.

DRHA also challenges the sufficiency of the evidence with respect to the second element – that DRHA took a materially adverse action against Carnell.  However, DRHA's brief focuses only on certain actions identified by Michael Scales without discussing the fact that Carnell was ultimately terminated from the Project.  Carnell's termination obviously constitutes a materially adverse action.  Likewise, the court concludes that, given the particular circumstances, the alleged threat of termination is also sufficient to satisfy this element.  See, e.g., D'Andrea v. Univ. of Haw.,  686 F. Supp. 2d 1079, 1088 (D. Haw. 2010) ("Threats may rise to the level of an adverse employment action in a retaliation claim if, under the particular circumstances, those

threats would have deterred a reasonable employee from engaging in protected activity.");

EEOC v. Collegeville/Imagineering, No. CV05-3033, 2007 U.S. Dist. LEXIS 51528, *21-22 (D.

Ariz. July 16, 2007) ("Construed in Plaintiff's favor, the evidence shows that Nitz threatened to

terminate Limon if she continued to engage in protected activity and that Nitz had the power to

carry out that threat.  This might well have dissuaded a reasonable worker in Limon's position

from engaging in protected activity.").

 DRHA also argues that Carnell cannot establish a causal link between its complaints of

discrimination and the adverse actions.  This argument, however, is also without merit.   As

discussed above, Carnell was threatened with termination immediately after complaining to

Wasson, and removed from the project less than a month after Carnell complained to the Board

of Commissioners.  The fact that these actions occurred so closely in time to Carnell's

complaints provides a sufficient inference of causation to satisfy the third required element.  See

Tinsley v. First Union Nat. Bank, 155 F.3d 435, 443 (4th Cir. 1998) ("[W]e have held that

merely the closeness in time between filing a discrimination charge and an employer's firing an

employee is sufficient to make a prima facie case of causality.").  Additionally, and perhaps even

more probative of causation and pretext, is the trial testimony of Sylvester Mayo that he was

upset with Carnell for complaining of race discrimination and that Carnell's complaint was a

factor in his  recommendation that Carnell be terminated from the Project.  In light of the

foregoing, the court is convinced that the evidence, taken in the light most favorable to Carnell,

is sufficient to establish a prima facie case of retaliation.

 DRHA also argues it was justified in terminating Carnell and in taking other adverse

actions, and that Carnell cannot establish pretext.  This argument is also unpersuasive.  In addition to Mayo's testimony, the record reveals that DRHA has provided shifting explanations for Carnell's termination.  As Judge Kiser explained in his May 3, 2011 opinion, DRHA has asserted that Carnell's contract merely expired; that Carnell was terminated for default pursuant to Section 32 of the HUD General Conditions; and that Carnell was not terminated for default. Such shifting explanations, as Judge Kiser emphasized, are probative of pretext.  Carnell Constr. Corp., 2011 U.S. Dist. LEXIS 47125, at *19.

Additionally, as Carnell emphasizes in its brief in opposition to DRHA's motion, the record now contains additional inconsistencies regarding the Board of Commissioners' role in the decision to terminate Carnell.  Although Mayo testified that he recommended that Carnell be terminated once the Board received Carnell's race discrimination complaint, and Gary Wasson testified that the Board "endorsed" the decision to terminate Carnell (2/9/2011 Trial Tr. at 125), Mayo now denies that Carnell's race discrimination complaint was a factor in any decisions he made regarding Carnell.  Wasson likewise denies that the Board made any recommendations regarding Carnell's termination, much less endorsed his decision to terminate Carnell.  In light of the foregoing, the court is convinced that genuine issues of material fact preclude the entry of summary judgment, and that the retaliation claim must be decided by the jury.

### 6.        The Effect of Gebser

Citing the Supreme Court's decision in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), DRHA also argues that Carnell cannot recover monetary damages for its Title VI claims "because to do so would be to award damages to Carnell on a theory of respondeat superior, which is clearly prohibited under Title VI."  (DRHA Br. in Supp. of Summ.

J. at 64).  For the following reasons, however, the court concludes that <u>Gebser</u> is not controlling in the instant case.

In <u>Gebser</u>, the Supreme Court considered when a school district may be held liable in damages under Title IX  for the sexual harassment of a student by one of the district's teachers. <u>Id.</u> at 277.  Like Title VI, Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds."  <u>Id.</u> at 286.  Given the contractual nature of Title IX, the Supreme Court emphasized that a funding recipient must have notice that it may be liable for a monetary award before it can be subjected to monetary damages.  <u>Id.</u> at 287.  Because imposing liability on a school district for a teacher's sexual harassment based on principles of constructive notice or respondeat superior would mean that the district was completely unaware of the discrimination, the Court reasoned that it was "sensible to assume that Congress did not envision a recipient's liability in damages in that situation."  <u>Id.</u>   Instead, the Court held that a school district may not be held liable in damages for the sexual harassment of a student by one of the district's teachers "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."  <u>Id.</u> at 277.

In this case, the circumstances are clearly distinguishable from those in <u>Gebser</u>, where neither the school principal nor any other school district official was aware of the teacher's misconduct.  Here, the discriminatory and retaliatory conduct at issue was allegedly undertaken by DRHA officials themselves – DRHA's Title VI Director, its Executive Director, and members of its Board of Commissioners.  Accordingly, the court agrees with Carnell that the

concerns expressed by the Court in <u>Gebser</u> are not present in the instant case, and that the

decision does not preclude an award of monetary damages against DRHA.  <u>See</u> <u>Jackson v.</u>

<u>Birmingham Bd. of Educ.</u>, 544 U.S. 167, 182, 184 (2005) (emphasizing that the limitation on

private damages actions discussed in <u>Gebser</u> "is not a bar to liability where a funding recipient

intentionally violates the statute," and that "[a] reasonable school board would realize that

institutions covered by Title IX cannot cover up violations of that law by means of

discriminatory retaliation" (internal citation and quotation marks omitted)); <u>Rubio v. Turner</u>

<u>Unified Sch. Dist. No. 202</u>, 453 F. Supp. 2d 1295, 1306 (D. Kan. 2006) (distinguishing <u>Gebser</u>

and emphasizing that the school district could be held liable for the acts of a school principal

where the principal "knew of the teacher's misconduct and participated in it").

### 7.        <u>Recoverable Damages under Title VI</u>

Lastly, in moving for summary judgment on Carnell's Title VI claim, DRHA argues that

Carnell's claimed damages are speculative, and that speculative damages are not recoverable

under Title VI.  To the extent DRHA challenges the types of damages sought by Carnell,

DRHA's arguments were already considered and rejected by Judge Kiser in his opinion denying

DRHA's motion for judgment as a matter of law.  <u>See</u> <u>Carnell Constr. Corp.</u>, 2011 U.S. Dist.

LEXIS 47125, at *29 (concluding "that Plaintiff's damages are recoverable under Title VI").

Judge Kiser's decision, which was not clearly erroneous, will not be disturbed by this court.

To the extent DRHA challenges the admissibility or weight of Carnell's evidence on

damages, the court is constrained to conclude that such issues are better suited for determination

at trial.  As the court emphasized during the hearing on the instant motions, however, Carnell

will not be allowed to present evidence of damages merely through the testimony of its own

officers as to contracts and jobs that it might have received but for the termination of the Contract at issue in this case. Instead, this alleged element of damages may be proven by independent means.

For the reasons stated, DRHA's motion for summary judgment will be granted in part and denied in part.

## II.   Blaine Square's Motion for Summary Judgment

Blaine Square was originally named as a defendant only with respect to Carnell's breach of contract claim. When Carnell was granted leave to file a third amended complaint after the case was transferred to the undersigned judge, Carnell added claims against Blaine Square for race discrimination and retaliation under § 1981 and Title VI. Blaine Square has moved for summary judgment with respect to all three sets of claims.

### A.   Additional Facts Regarding Blaine Square

Prior to evaluating Carnell's claims against Blaine Square, the court will provide additional background on this defendant. As set forth above, the Blaine Square Project was a mixed-finance development as defined by the applicable HUD regulations. Pursuant to the Hope VI mixed-finance model, both private funds and public funds were combined to fully fund the construction of the Project. As part of the mixed-financing deal, Blaine Square was established as a passive entity through which the Project was to obtain low-income housing tax credits in order to entice private investment into the Project.

Blaine Square's ownership structure and the roles of Blaine Square and DRHA were explained in Exhibit B of the Mixed Finance Amendment to Consolidated Annual Contributions Contract for Blaine Square/Liberty View Phase 4A ("Mixed Finance Amendment"), which was

included as an exhibit with Blaine Square's motion for summary judgment.  The section describing the ownership structure listed Danville Housing Company, Inc., a non-profit instrumentality of the Authority, as the managing member; Centerline Corporate Partners XXXVI LP as the investor member; and Centerline Corporate XXXVI SLP LLC as the special member.  The section describing the "Activities and Responsibilities of Participating Parties" provided that DRHA would be responsible for developing the Project for which it would receive a developer's fee.  (Blaine Square Mot. for Summ. J. Ex. 2).

Blaine Square's Amended and Restated Operating Agreement ("Operating Agreement") was executed on June 1, 2008.  Consistent with Exhibit B of the Mixed Financed Amendment, the Operating Agreement lists Danville Housing Company, Inc. as the managing member of Blaine Square; Centerline Corporate XXXVI SLP, LLC as the special member; and Centerline Corporate Partners XXXVI, LP as the investor member.  According to the Operating Agreement, Blaine Square's primary purpose is "to provide low-income housing to poor and distressed persons" by participating in the development of housing "in a manner consistent with the requirements of Section 42 of the [Internal Revenue Service] Code and Revenue Procedure 96-32."  (Blaine Square Mot. for Summ. J. Ex. 3).  The Operating Agreement was signed by Gary Wasson as Executive Director of DRHA, and as President of Danville Housing Company, Inc.[8]

During the construction phase of the Blaine Square Project, DRHA served as the developer.  In its role as developer, DRHA issued requests for proposals for the site work portion

---

[8] Section 14.2 of the Operating Agreement grants the President of the managing member (Danville Housing Company, Inc.) the power of attorney to sign on behalf of the managing member the Operating Agreement and other "documents, conveyances, leases, contracts, loan documents and/or counterparts thereof."  (Blaine Square Mot. for Summ. J. Ex. 3).

of the construction.  Carnell, the low bidder, was chosen to perform the site work by DRHA, and Carnell entered into a contract with DRHA on May 27, 2008.

Blaine Square was not involved in either the solicitation of proposals or the negotiation of the site work contract with Carnell.  Likewise, Blaine Square was not involved in the solicitation of bids or the negotiation of the construction contract with Commodore Homes, the contractor responsible for constructing the housing units.

In order to preserve Blaine Square's eligibility for tax credits, tax counsel for Blaine Square recommended that the Carnell contract and the Commodore contract be assigned to Blaine Square.  (McCormick Dep. Tr. at 27, 30-31; see also 3d Am. Compl. at ¶ 25 ("Upon information and belief, the Assignment [of the Carnell contract] was executed for tax purposes.")).  The assignment was completed on June 9, 2008.

Three days later, on June 12, 2008, Blaine Square entered into a Development Services Agreement with DRHA, pursuant to which Blaine Square retained DRHA as an independent contractor to provide construction management services related to the construction of the Project, in exchange for a development fee of $859,560.00.  Gary Wasson signed the Development Services Agreement on behalf of DRHA as its Executive Director, and on behalf of Blaine Square, as the President of Danville Housing, Inc.

The services DRHA agreed to provide pursuant to the Development Services Agreement include, but are not limited to, the following: consulting with the general contractor and architect(s) in connection with the planning and design of the Project; obtaining all permits necessary for the construction of the Project; interviewing, selecting and advising with respect to the hiring of site work contractors to undertake the site improvements of the Project;

recommending plans to encourage participation by minority and locally owned businesses consistent with local, state, and federal law; supervising the construction of the Project; and negotiating and enforcing all contracts, actions, and arrangements that must be made or carried out in conjunction with the construction of the Project.  (Blaine Square Mot. for Summ. J. Ex. 5).

The Development Services Agreement expressly states that Blaine Square retained DRHA as an independent contractor and that DRHA "shall not at any time be deemed an employee" of Blaine Square.  (Blaine Square Mot. for Summ. J. Ex. 5).  The Agreement further provides that "[n]othing herein contained shall be construed to constitute any party as the agent of another party, or in any manner to limit the parties in carrying on their respective business or activities."  Id.  Consistent with the Development Services Agreement, as Carnell affirmatively alleges in its third amended complaint, "DRHA continued to direct Carnell's work on the Project after the Assignment" of the Contract to Blaine Square.  (3d Am. Compl. at ¶ 26).

### B.    Breach of Contract Claim

As described above, the Contract between Carnell and DRHA was assigned to Blaine Square for tax purposes.  In moving for summary judgment on Carnell's breach of contract claim, Blaine Square merely adopts the arguments asserted in support of DRHA's motion for summary judgment, without asserting any additional arguments.  Specifically, Blaine Square contends that it "stands in the shoes of the assignor" for purposes of the Contract and, thus, that "[t]o the extent that DRHA would be entitled to governmental protections against waiver or the application of the VPPA, Blaine Square would be entitled to those same protections pursuant to the assignment."  (Blaine Square Reply Br. in Supp. of Mot. for Summ. J. at 10).

36

For the reasons discussed above, the court has concluded that genuine issues of material fact preclude the entry of summary judgment in DRHA's favor on the breach of contract claim. It follows that Blaine Square's motion for summary judgment must also be denied with respect to this claim.

### C.      Claims under § 1981

Blaine Square has also moved for summary judgment with respect to Carnell's race discrimination and retaliation claims under 42 U.S.C. § 1981. For the following reasons, the court concludes that Carnell has no cause of action against Blaine Square under § 1981 and, thus, that Blaine Square is entitled to summary judgment with respect to these claims.

Section 1981 "can be violated only by intentional discrimination." Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1992); see also NAACP Labor Comm. v. Laborers' Int'l Union of N. Am., 902 F. Supp. 688, 711 (W.D. Va. 1995) ("Section 1981 requires proof of intentional discrimination."). Because there is no evidence that Blaine Square, which has no individual officers or employees, participated directly in any discriminatory or retaliatory conduct, Blaine Square may be subject to liability under § 1981 only if it enjoyed control over the actions of which Carnell complains.

In General Building Contractors, representatives of a class of racial minorities, who were skilled as operating engineers in the construction industry, brought a claim under § 1981 alleging that a union discriminated against them on the basis of race in the operation of a hiring hall, which established contracts between union members and industry employers. General Bldg. Contractors, 458 U.S. at 378. The plaintiffs also alleged that the union discriminated on the basis of race in the operation of an apprenticeship program established by the union and several

37

trade associations.  Id.  The Supreme Court addressed two issues: whether liability under § 1981 requires proof of discriminatory intent; and whether, absent such proof, liability could nevertheless be imposed vicariously on the trade associations and employers for the union's intentional discrimination.  Id.

After examining the legislative history of § 1981, the Supreme Court concluded that the statute "can be violated only by purposeful discrimination."  Id. at 391.  With respect to the second issue, the Supreme Court observed that "[e]ven if the doctrine of respondeat superior were broadly applicable to suits based on § 1981, . . . it would not support the imposition of liability on a defendant based on the acts of a party with whom it had no agency or employment relationship."  Id. at 392.  At the core of an agency relationship, the Supreme Court explained, "is a fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control"; likewise, "equally central to the master-servant relationship is the master's control over or right to control the physical activities of the servant."  Id.  at 393 (internal citations and quotation marks omitted).  Upon examining the facts in the record, the Court concluded that there was no evidence that the employers or trade associations enjoyed the right to control the activities of the union.  Id. at 394-95.  Consequently, the Court concluded as follows: "On the assumption that respondeat superior applies to suits based on § 1981, there is no basis for holding either the employers or the associations liable under that doctrine without evidence that an agency relationship existed at the time [the union] committed the acts on which its own liability was premised."  Id. at 395.

The United States Court of Appeals for the Fifth Circuit considered a similar claim in Arguello v. Conoco, Inc., 207 F.3d 803 (5th Cir. 2000), which involved a § 1981 claim brought

in relation to the racially discriminatory acts of clerks at independently owned Conoco gas stations.  Id. at 805-07.  Applying General Contractors, the Fifth Circuit held that the plaintiffs could not recover against Conoco unless the plaintiffs showed that the gas stations had an agency relationship with Conoco.  Id. at 807.  The Court ultimately concluded that Conoco had no agency relationship with the gas stations, because Conoco lacked control over the daily operations of the gas stations or the stations' personnel decisions.  Id. at 808.  In reaching its conclusion, the Court relied upon the "plain language" of the contracts between Conoco and the gas stations, which specified that each station was an "independent business" and that neither Conoco nor the individual station was an agent of the other.  Id. at 808.  Having found that there was no agency relationship, the Court held that Conoco "as a matter of law cannot be held liable for the unfortunate incidents" which occurred at the gas stations.  Id.

The Fifth Circuit applied the same principles four years later in Causey v. General Motors Corp., 394 F.3d 285 (5th Cir. 2004), a case in which the plaintiff sought to recover against General Motors for racial discrimination that allegedly occurred at a General Motors authorized dealership.  Causey, 395 F.3d at 287.  In affirming the dismissal of the § 1981 claim against General Motors, the Court emphasized that "the documents provided by GM show that Sewell is an independent business and that GM does not control Sewell's daily operations."  Id. at 290.

District courts have likewise refused to subject an entity to liability for a third party's actions under § 1981, where the entity enjoyed no control over the actions at issue.  See, e.g., Ashby v. Am. Legion, No. 1:07CV248, 2011 U.S. Dist. LEXIS 37817, at *7-8 (N.D. Miss. Apr. 4, 2011) ("The only control these two defendants exert over Post 130 is revoking its charter and

39

hearing appeals on such revocation.  Thus, the defendants do not control day-to-day operations

and cannot be liable for Post 130's alleged actions that deprived Ashby of a right to enjoy

contractual benefits."); Ndulue v. Fremont-Rideout Health Group, No. 2:08-1696, 2010 U.S.

Dist. LEXIS 63189, at *29-30 (E.D. Cal. June 25, 2010) ("Since plaintiff has not provided any

evidence of independent conduct by FRHG and has not provided evidence that the doctor

defendants were supervisors under the control of FRHG, the court must grant FRHG's motion

for summary judgment as to plaintiff's § 1981 claim."); Garrett-Greer v. Key Staff Source, Inc.,

No. 1:08CV229, 2010 U.S. Dist. LEXIS 44518, at *13-14 (N.D. Miss. May 6, 2010) ("The

undisputed facts . . . show that Key Staff enjoyed no control over the amount that Plaintiff was

paid, the length of her work assignment, or the circumstances under which her employment

ended.  Therefore, no agency relationship existed between Key Staff and Fiber Direct with

respect to those issues, and Key Staff can not be held liable for Fiber Direct's actions relating

thereto.");  Perry v. Burger King Corp., 924 F. Supp. 548, 554-555 (S.D.N.Y. 1996) (granting

summary judgment in favor of Burger King Corporation ("BKC") on the plaintiff's

discrimination claims, where "[t]he nature of the franchisor-franchisee relationship . . . , the

Franchise Agreement, and the affidavit of BKC's in-house counsel all demonstrate[d] that

plaintiff ha[d] not presented a triable issue" regarding BKC's level of control over its

franchisee).

       In the instant case, Carnell has failed to proffer evidence from which a reasonable jury

could find that Blaine Square enjoyed control over the actions of which Carnell complains.  As

an initial matter, the court notes that it is undisputed that Blaine Square was not involved in

either the solicitation of bid proposals or the negotiation of the Contract with Carnell.  Instead,

the Contract was negotiated and entered into with DRHA, prior to the execution of the Blaine

Square Operating Agreement or the Development Services Agreement.  Therefore, Blaine

Square clearly had no control over, and cannot be subject to liability, based on the terms and

conditions of the Contract, or its negotiation and formation.

 Carnell's remaining allegations of discrimination and retaliation all pertain to

construction management actions that were undertaken by DRHA pursuant to the Development

Services Agreement, which defines the relationship between DRHA and Blaine Square.  The

Development Services Agreement, like the agreements in Arguello and Perry, makes clear that

DRHA was solely responsible for managing the construction of the Project as an independent

contractor, and that DRHA was not acting as an employee or agent of Blaine Square while

discharging its management responsibilities.  Stated differently, the Agreement provides no basis

upon which one could conclude that Blaine Square retained control over the daily management

of the construction of the Project or the supervision of Carnell or other contractors.

 In response to Blaine Square's motion for summary judgment, Carnell argues, in

summary fashion, that the Development Services Agreement is "of no moment" (Br. in Opp'n at

15), and that the fact that Blaine Square authorized DRHA to manage the construction of the

Project and the Project's contractors is sufficient to establish the existence of an agency

relationship.  As Blaine Square emphasizes in its reply brief, however, such relationship requires

"the consent by one person to another that the other shall act on his behalf and subject to his

control."  Arguello, 207 F.3d at 807 (emphasis added).  In other words, "the power of control . . .

is crucial to the determination" of whether an agency relationship existed.  Schwartz v.

Brownlee, 482 S.E.2d 827, 830 (Va. 1997).  In this case, Carnell has pointed to no evidence that

suggests that Blaine Square retained the right to control the actions undertaken by DRHA in the performance of DRHA's construction management responsibilities.

Alternatively, Carnell argues that Gary Wasson "perpetrated the discriminatory and retaliatory conduct suffered by Carnell," (Carnell Br. in Opp'n to Summ. J. at 11), and that a reasonable jury could find that Wasson's conduct was taken "in his capacity with Blaine Square, LLC." (Carnell Br. in Opp'n to Summ. J. at 12). Relying on two documents that Wasson signed on behalf of Blaine Square as its "President," Carnell repeatedly asserts that Wasson is the President of Blaine Square and, thus, that he was acting on behalf of Blaine Square at all times relevant to the instant action. As Blaine Square emphasizes, however, both documents on which Carnell relies predate Blaine Square's Operating Agreement and other formation documents, which establish that Blaine Square has no employees or officers and that its members include only three entities – a managing member, an investment member, and a special member.

While the record reveals that Wasson did serve as President of Blaine Square's managing member, Danville Housing Company, there is no evidence that Wasson or the managing member was bestowed with any authority to act on behalf of Blaine Square with respect to Carnell. As Blaine Square emphasizes in its reply brief, the sole authority granted by Blaine Square to any entity to administer Carnell's site improvement contract is the Development Services Agreement between Blaine Square and DRHA, which provides that Blaine Square retained DRHA as an independent contractor to manage the construction of the Project. Carnell has provided no authority for the proposition that the court should ignore the terms of this critical document, which defines the respective roles of DRHA and Blaine Square, and supports the determination that Wasson was not Blaine Square's agent during the construction phase of the Project.

42

For these reasons, the court concludes that Blaine Square cannot be held liable under §

1981 for the actions of DRHA or Wasson.  Accordingly, the court will grant Blaine Square's

motion for summary judgment with respect to Carnell's § 1981 claims.

### D.    Claims under Title VI

Blaine Square has also moved for summary judgment on Carnell's claims under Title VI.

As discussed above, Title VI prohibits only intentional discrimination.  Jackson, 544 U.S. at 178

(citing Alexander v. Sandoval, 532 U.S. 275 (2001)).  In the absence of any evidence of

intentional discrimination on the part of Blaine Square or its members, or any authority which

would suggest  that Blaine Square could be held liable for the actions of DRHA, Wasson, or

other third parties, the court likewise concludes that Blaine Square is not subject to liability

under Title VI.

For all of the foregoing reasons, Blaine Square's motion for summary judgment will be

granted in part and denied in part.

### III.    Carnell's Motion for Summary Judgment

Carnell has moved for summary judgment on DRHA's counterclaim for breach of

contract and with respect to DRHA's defense to Carnell's breach of contract claims.

DRHA filed a counterclaim for breach of contract, alleging that Carnell breached the

Contract by performing defective and/or non-conforming work; and by failing to complete work

required by the Contract.  In moving for summary judgment with respect to the counterclaim,

Carnell argues that DRHA failed to comply with the contractual prerequisites for bringing such claim.[9]

As noted above, the Contract included two sets of general conditions.  Article 10.05 of the EJCDC General Conditions, titled "Claims," provides that "[a]ll Claims, except those waived pursuant to Paragraph 14.09, shall be referred to the Engineer for decision," and that a "decision by Engineer shall be required as a condition precedent to any exercise by Owner or Contractor of any rights or remedies either may otherwise have under the Contract Documents or by Laws and Regulations in respect of such Claims."  The term "Claim" is defined as a "demand or assertion by Owner or Contractor seeking an adjustment of Contract Price or Contract Times, or other relief with respect to the terms of the Contract."

The HUD General Conditions also include provisions governing "Disputes."  Section 31 provides that, with the exception of disputes arising under the section entitled "Labor Standards - Davis Bacon and Related Acts," "all disputes arising under or relating to this contract, including any claims for damages for the alleged breach thereof which are not disposed of by agreement, shall be resolved under [Section 31]."  Section 31 then sets forth the following procedure:

> (C)     All claims by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision.  A claim by the PHA [Public Housing Authority] against the Contractor shall be subject to a written decision by the Contracting Officer.

―――――――――――――

[9] Carnell also argues that the counterclaim is not properly before the court because it was not refiled in response to Carnell's third amended complaint.  As DRHA notes in its brief in opposition, however, courts have held that such a refiling is not necessary.  See, e.g., Ground Zero Museum Workshop v. Wilson, No. 09-3288, 2011 U.S. Dist. LEXIS 94666, at *65 (D. Md. Aug. 24, 2011) (adopting the reasoning set forth in Dunkin' Donuts, Inc. v. Romanias, No. 00-1886, 2002 U.S. Dist. LEXIS 28405 (W.D. Pa. May 29, 2002) and holding that a counterclaim is independent from an answer and, thus, that revisions to a complaint do not require revisions to a counterclaim).

(D)   The Contracting Officer shall, within 60 (unless otherwise indicated) days after receipt of the request, decide the claim or notify the Contractor of the date by which the decision will be made.

(E)   The Contracting Officer's decision shall be final unless the Contractor . . . files suit in a court of competent jurisdiction.

The term "Contracting Officer" is defined as "the person delegated the authority by the PHA to enter into, administer, and/or terminate the contract and designated as such in writing to the Contractor."  The term "Claim," as used in Section 31, means "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."

        To the extent DRHA seeks to recover damages for defective work, the court agrees with Carnell that such claim is barred by DRHA's failure to comply with the contractual dispute provisions.  As set forth above, Virginia courts have held that "[w]hen a contract provides for the performance of special conditions before a party is entitled to payment, the conditions must be performed unless the other party prevents or waives their performance."  Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va. 1984).  While Judge Kiser previously held, in ruling on DRHA's first summary judgment motion, that a reasonable jury could find that DRHA waived its right to enforce the contractual dispute resolution procedures and instead agreed to incorporate all of Carnell's claims into the parties' mediation efforts, there is no evidence that the parties waived or modified the Contract's claims or dispute procedures with respect to DRHA's claims. Likewise, it is undisputed that DRHA never raised a single claim against Carnell for defective work at any time during the project or during the course of the parties' mediation.  Indeed, during his deposition, Gary Wasson confirmed that "at no time prior to the time when Carnell

45

was removed from the project did DRHA make a demand upon Carnell for the payment of any money or otherwise make any demand for damages."  (Wasson 2011 Dep. at 102).  When asked if DRHA "br[ought] any claims up in the mediation . . . for damages from Carnell," Wasson responded in the negative.  Id.

In light of the foregoing, and in the absence of any argument as to why DRHA's claim for  damages arising from defective work was not subject to the contractual notice and dispute resolution provisions, the court will grant Carnell's motion with respect to this portion of DRHA's counterclaim.  On the other hand, to the extent DRHA's breach of contract claim seeks to recover damages resulting from incomplete work, Carnell's motion will be denied.

DRHA contends that its attempt to recover the costs of performing incomplete work is pursued under Section 32(a) of the HUD General Conditions, and that compliance with the dispute resolution provisions of Section 31 is not a condition precedent to its right to recover damages under Section 32(a).  DRHA emphasizes that Section 32 is silent with regard to whether the contractor or surety's liability under that section is a "claim" or "dispute" for purposes of Section 31.  DRHA notes that, in this regard, Section 32 is distinguishable from Section 34 ("Termination for Convenience"), which specifically states that "any disputes with regard to this clause are expressly made subject to the provisions of the Disputes clause of this Contract."  DRHA also emphasizes that Section 32 provides that the contractor and its sureties "shall be liable" for any damages resulting from the Contractor's failure to complete the work within the specified time.  In light of such language, and given the absence of any reference to the dispute resolution procedure set forth in Section 31, DRHA argues that Section 32 provides a separate, distinct remedy for recovering  damages arising from a contractor's incomplete work, and that such claim is not subject to the dispute resolution procedure in the preceding section.

Having considered the parties' arguments, the court is constrained to conclude that there is some ambiguity as to the applicability of the dispute resolution procedure to a claim for damages under Section 32 of the HUD General Conditions, and that a jury must decide whether DRHA properly complied with all necessary contractual conditions.  For these reasons, Carnell's motion for partial summary judgment will be denied to the extent that DRHA seeks damages resulting from incomplete work.

Carnell's motion for summary judgment will also be denied to the extent Carnell seeks to preclude DRHA from arguing that it terminated Carnell's right to proceed pursuant to Section 32 of the HUD General Conditions.  While the record contains inconsistencies in this regard, the court is convinced that it is within the province of the jury to determine whether DRHA acted pursuant to Section 32 and, if so, whether DRHA satisfied all the applicable contractual requirements.

### Conclusion

For the reasons stated, DRHA's motion for summary judgment will be granted in part and denied in part; Blaine Square's motion for summary judgment will be granted in part and denied in part; and Carnell's motion for summary judgment will be granted in part and denied in part.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER:  This 23rd day of January, 2012.

_/s/  Glen E. Conrad_____
Chief United States District Judge

47